J-S74025-13

2014 PA Super 283

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| DELANO E. PEREL | : | |
| | : | |
| Appellant | : | No. 704 WDA 2013 |

Appeal from the Judgment of Sentence of March 27, 2013
In the Court of Common Pleas of Mercer County
Criminal Division at No.: CP-43-CR-0000618-2011

BEFORE:  PANELLA, J., OLSON, J., and WECHT, J.

OPINION BY WECHT, J.:                    **FILED DECEMBER 23, 2014**

Delano Perel appeals the judgment of sentence entered on March 27, 2013.  We vacate Perel's judgment of sentence, and we remand for additional proceedings consistent with this opinion.

On April 21, 2011, Officer Louis Squatrito of the Hermitage Police Department responded to a report of an armed robbery.  When he arrived at the scene, Officer Squatrito found Darius Holcomb hiding in the woods behind an apartment building.  According to Holcomb, he and his former cellmate, Perel, departed together for an overnight trip on that evening.  While traveling together (with Perel driving and Holcomb in the passenger seat), Perel announced that he needed to stop at his girlfriend's apartment.

Perel pulled into an apartment complex, shut off the engine, and pulled a small brown leather bag from underneath the driver's seat.

Perel told Holcomb to "run it,"[1] and Holcomb observed a handgun protruding from the leather bag. After Holcomb handed Perel approximately $100, Perel exited the vehicle and walked into one of the apartments, taking the leather bag with him. Holcomb ran into a wooded area that was adjacent to the apartment complex and called the police. Before Officer Squatrito arrived at the scene, Holcomb saw Perel—now accompanied by a black female—drive away in a tan Chevrolet.

Chad Nych, another officer with the Hermitage Police Department, received a Mercer County 9-1-1 radio dispatch describing Perel, the unknown black female, and the tan Chevrolet. Officer Nych subsequently observed a tan Chevy Impala parked in front of the Sheetz convenience store on Route 18 in Hermitage. When Officer Nych approached the vehicle, he observed a black male matching Holcomb's description of Perel and a black female in the passenger seat. Officer Nych ordered Perel to exit the vehicle. Thereafter, Officer Nych searched Perel and discovered a bag of marijuana, currency, and a marijuana cigarette in Perel's pockets. Officer Nych then took Perel into custody.

---

[1]    Holcomb explained at trial that "run it" is slang for "give me your money." Notes of Testimony Suppression ("N.T.S."), 11/9/2011, at 13.

Sergeant Donald Ott spoke with the female passenger, who he identified as Tony Smith, Perel's girlfriend. Sergeant Ott sought Smith's consent to search her apartment located at 1420 Parke Drive. Smith initially refused to consent to the search but later agreed. Smith signed a written consent form specifying that the police were searching for a black handgun, ammunition, and a "black or brown leather bag similar to a hygiene/shaving kit bag." Notes of Testimony Suppression ("N.T.S."), 11/9/2011, at 48.

In the rear bedroom of Smith's apartment, officers observed a small brown leather bag/shaving kit on the foot of the bed, which was consistent with Holcomb's description. Upon opening the bag, Captain Paul Jewell discovered marijuana, a handgun, ammunition, and condoms. Captain Jewell showed these items to Smith, who denied having any knowledge of them. Captain Jewell also searched two pieces of luggage that were beside the shaving kit. Therein, he found men's clothing and a receipt with Perel's name on it.

As a result of these events, Officer Squatrito filed a criminal complaint charging Perel with robbery, persons not to possess a firearm, forgery, firearms not to be carried without a license, theft by unlawful taking, receiving stolen property, delivery of a controlled substance, possession of a

controlled substance, and possession of drug paraphernalia.[2]   On October 14, 2011, Perel filed an omnibus pretrial motion to suppress evidence. Therein, Perel argued that the warrantless search of his shaving kit and luggage was unconstitutional because Smith lacked the authority to consent to the search of his personal effects.   Omnibus Motion for Pre-trial Relief, 10/14/2011, at 3 (unnumbered).   On November 9, 2011, following a hearing, the trial court denied Perel's motion to suppress by opinion and order.

After the trial court, *sua sponte*, severed the persons not to possess a firearm count from the information, Perel proceeded to a jury trial on that charge alone on November 14, 2012.   On November 16, 2012, the jury found Perel guilty of persons not to possess a firearm.   On March 25, 2013, Perel pleaded guilty to possession with intent to deliver, and the Commonwealth *nolle prossed* the remaining charges.   On March 25, 2013, the trial court sentenced Perel to five to ten years' imprisonment for persons not to possess a firearm with a consecutive term of one to five years' imprisonment for possession with the intent to deliver.

On April 23, 2013, Perel timely filed a notice of appeal.   On May 1, 2013, the trial court ordered Perel to file a concise statement of errors

---

[2]   18 Pa.C.S. §§ 3701(a)(1)(iii), 6105(a)(1), 4101(a)(1), 6106(a)(1), 3921(a), and 3925; 35 P.S. §§ 780-113(a)(30), 780-113(a)(16), and 780-113(a)(32), respectively.

complained of on appeal pursuant to Pa.R.A.P. 1925(b). Perel timely complied. On May 31, 2013, the trial court issued an opinion pursuant to Pa.R.A.P. 1925(a).

Perel presents one issue for our consideration: "Did the trial court abuse its discretion in denying [Perel's] motion to suppress evidence where [Perel's] personal belongings were searched without a search warrant?" Brief for Perel at 4 (capitalization modified).

> Our standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, we are bound by these findings and may reverse only if the court's legal conclusions are erroneous. Where . . . the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to our plenary review.

**Commonwealth v. Jones**, 988 A.2d 649, 654 (Pa. 2010) (citations omitted).

"The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure." **Rakas v. Illinois**, 439 U.S. 128, 130 n.1 (1978). This is so because "Fourth Amendment rights are personal rights which, like

some other constitutional rights, may not be vicariously asserted." *Id.* at 133–34 (1978) (quoting *Alderman v. United States*, 394 U.S. 165, 174 (1969)). Thus, before a defendant may challenge a search or seizure on Fourth Amendment grounds, he or she must demonstrate a reasonable expectation of privacy in the place that was searched.

As articulated by Justice John Marshall Harlan in his oft-quoted concurrence in *Katz v. United States*, a person who challenges a search or seizure on Fourth Amendment grounds must demonstrate (1) that he or she had a subjective expectation of privacy, and (2) that his or her subjective expectation of privacy is one that society is prepared to recognize as reasonable and legitimate. 389 U.S. 347, 361 (1967) (Harlan, J., concurring).

With regard to Perel's subjective expectation of privacy in the contents of his luggage and shaving bag, it is well established that the key inquiry is whether Perel "took normal precautions to maintain his privacy." *Rawlings v. Kentucky*, 448 U.S. 98, 105 (1980); *Smith v. Maryland*, 442 U.S. 735, 740 (1979) (explaining that an individual exhibits a subjective expectation of privacy if he or she sought to preserve something as private). Instantly, Perel placed his possessions in an opaque leather bag. He then zippered that bag closed and stored it in the "back bedroom" of his girlfriend's

apartment (specifically "on the foot of the bed"). N.T.S. at 49. Moreover, Perel did not inform Smith of the contents of the bag. *Id.* at 50.[3]

The United States Supreme Court has held that searches of closed containers (*i.e.,* personal luggage) intrude upon protected privacy interests as a matter of law. **See New Jersey v. T.L.O.**, 469 U.S. 325, 337 (1985) ("[T]he Fourth Amendment provides protection to the owner of every container that conceals its contents from plain view." (quoting **United States v. Ross**, 456 U.S. 798, 822–23 (1982)). Hence, the search of Perel's luggage and shaving kit violated Perel's subjective expectation of privacy.

Turning to the second prong of the **Katz** test, Perel's subjective expectation of privacy must be one that society is prepared to recognize as reasonable. **Katz**, 389 U.S. at 361. No single factor determines the legitimacy of an individual's claim that a particular area should be free from warrantless government intrusion. **Rakas**, 439 U.S. at 152–53 (Powell, J., concurring). Our analysis may turn on factors such as (1) the intention of

_____

[3] At the suppression hearing, Captain Jewell testified that Smith denied having knowledge of the contents of Perel's shaving kit. N.T.S. at 50. The learned Dissent maintains that "[t]here was no evidence regarding what [Perel] may or may not have told [Smith] about his shaving kit." Dis. Op. at 1-2, n.1. Of course, if Perel had told Smith about the items in his bag then she would have known about them. Although we are limited to considering only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted, **Jones**, *supra*, we are not required to suspend logic and common sense.

the Framers of the Fourth Amendment, *Oliver v. United States*, 466 U.S. 170, 178 (1984); (2) the uses to which an individual has put a particular location, *Jones v. United States*, 362 U.S. 257, 265 (1960); and (3) society's understanding that certain areas deserve "the most scrupulous protection from government invasion." *Oliver v. United States*, 466 U.S. 170, 178 (1984).

The United States Supreme Court applied these principles in *Bond v. United States*, 529 U.S. 334 (2000), concluding that a Border Patrol agent's physical manipulation of a bus passenger's carry-on luggage violated the Fourth Amendment. *Id.* at 338–39. In that case, Bond, a passenger on a Greyhound bus, stored his green canvas bag in a storage compartment above his seat. When the bus stopped at a permanent border checkpoint, a Border Patrol agent physically squeezed and manipulated the contents of Bond's overhead bag. The agent felt a "brick-like" object in Bond's bag, which the agent later determined to be a "brick" of methamphetamine wrapped in duct tape. *Id.* at 336.

The Supreme Court rejected the government's contention that Bond did not maintain a reasonable expectation of privacy in a container that he exposed to public view:

> When a bus passenger places a bag in an overhead bin, he expects that other passengers or bus employees may move it for one reason or another. Thus, a bus passenger clearly expects that his bag may be handled. He does not expect that other passengers or bus employees will, as a matter of course, feel the bag in an exploratory manner. But this is exactly what the agent did here.

***Id.***

We find nothing in the instant matter that materially distinguishes this case from the circumstances in ***Bond***.[4]  Perel stored his luggage and shaving kit in his girlfriend's bedroom along with his other belongings.  This location is not any more "exposed to public view" than an overhead storage compartment on a Greyhound bus.  Furthermore, the police opened Perel's luggage and shaving kit and explored their contents.  Hence, the instant search was far more invasive than the agent's unconstitutional "physical manipulation" of Bond's canvas bag.

Indeed, the obvious function of an opaque zippered bag is to safeguard the privacy of the personal effects contained therein.  ***See United States v. Chadwick***, 433 U.S. 1, 13 (1977). ("Unlike an automobile, whose primary function is transportation, **luggage is intended as a repository of personal effects.**" (emphasis added)).  An understanding that personal, private effects are commonly stored in purses, backpacks, luggage, and duffel bags can be gleaned from a casual stroll down any sidewalk.  The contents of persons' closed containers are obscured from public view and generally are recognized as private.  This expectation of privacy becomes even more robust when a person's private, closed container is within the

_____

[4]  ***See also United States v. Jacobsen***, 466 U.S. at 111, 114–15 (1984) (suggesting that the warrantless search of an "ordinary cardboard box wrapped in brown paper" would have violated the Fourth Amendment had a private third-party not already opened it).

home of a loved one. Perel's luggage and shaving kit, therefore, are deserving of "the most scrupulous protection from government invasion." *Oliver v. United States*, 466 U.S. 170, 178 (1984).

Perel's belongings were not openly visible, or even accessible, to the general public. The opaque containers clearly belonged to Perel. They were closed. They contained personal items, including men's clothing and condoms. It beggars belief to suggest that our society would deem it unreasonable to expect that these personal items will be kept private.[5] Perel's subjective expectation of privacy in the contents of his baggage, as evidenced by the totality of the circumstances, is one that society would recognize as reasonable.[6]

---

[5] When confronted with a factually analogous case, the Supreme Court of Arkansas reached the same conclusion. *Moore v. State*, 594 S.W.2d 245 (Ark. 1980) ("There could hardly be anything which would be considered more private than a shaving kit which ordinarily includes one's toothbrush, toothpaste, shaving equipment, medication and other highly personal items.").

[6] In contrast, cases in which a defendant has failed to demonstrate a reasonable expectation of privacy in a particular area are both rare and self-evidently distinguishable. *See California v. Greenwood*, 486 U.S. 35 (1988) (holding that society would not accept as reasonable a defendant's claim that he had a reasonable expectation of privacy in garbage that has been left outdoors for collection in an area accessible to the general public); *California v. Ciraolo*, 476 U.S. 207 (1986) (holding that the Fourth Amendment does not require that the police obtain a warrant before conducting surveillance of a fenced backyard from a private plane flying at an altitude of 1,000 feet).

Having concluded that the suppression record demonstrates that Perel had a reasonable expectation of privacy in his luggage and shaving kit, we now must address whether the warrantless search of Perel's luggage falls within the consent exception to the Fourth Amendment's warrant requirement.[7] The trial court ruled that it did, concluding that "[t]he search of [Perel's] brown leather bag . . . was lawful in that there were no restrictions on the scope of [Smith's] consent." Trial Court Opinion ("T.C.O."), 11/10/2011, at 8 (unnumbered). Perel, on the other hand, contends that the scope of Smith's consent did not, and could not, extend to Perel's leather shaving kit and luggage because Smith did not have common authority, joint access, or mutual use of those items. Brief for Perel at 14. We agree.

_____

[7] We focus our analysis upon the **search** of Perel's shaving kit. Nonetheless, the Dissent devotes a considerable amount of attention to emphasizing its belief that the **seizure** of the shaving kit was lawful. ***See*** Diss. Op. at 3, 11, 12, 13, 19, 20. Although it may be true that a seizure of the container prior to searching it would be constitutional, the record is not at all clear that such a sequence of events actually occurred. In other words, a seizure would be constitutional only if it happened **before** the search. However, Captain Jewell testified that he opened Perel's shaving kit immediately upon noticing it. N.T.S. at 49. Thus, the Dissent's insistence that the seizure was constitutional is not only immaterial to the ultimate resolution of the issue in this case, *i.e.,* the constitutionality of the search of the kit, but it is also not even clear from the record that the kit was in fact seized before it was searched.

It is well-settled that a homeowner who lacks access to, or control over, a guest's private closed containers also lacks the authority to consent to a search of them.

> A privacy interest in a home itself need not be coextensive with a privacy interest in the contents or movements of everything situated inside the home. This has been recognized before in connection with third-party consent to searches. A homeowner's consent to a search of the home may not be effective consent to a search of a closed object inside the home. Consent to search a container or a place is effective only when given by one with "common authority over or other sufficient relationship to the premises or effects sought to be inspected." **United States v. Matlock**, 415 U.S. 164, 171 (1974). "Common authority . . . rests . . . on mutual use of the property by persons generally having joint access or control for most purposes . . . ." **Id.** at 171, n.7.

**United States v. Karo**, 468 U.S. 705, 725 (1984) (O'Connor, J., concurring) (citations modified).

The critical inquiry is not whether Smith had the authority to consent to the search of her own apartment, but rather whether she had the actual authority, or the apparent authority, to consent to the search of Perel's closed containers stored therein. **Matlock**, 415 U.S. at 171. It is clear that she did not. The Commonwealth presented no evidence at the suppression hearing that Smith had mutual use of, joint access to, or control of Perel's baggage. To the contrary, Captain Jewell testified that Smith denied having knowledge of the contents of Perel's shaving kit. N.T.S. at 50. Thus, the search of Perel's belongings can not be justified based upon Smith's actual authority to consent.

As stated, we also must consider the possibility that Smith had the apparent authority to consent to a search of Perel's luggage and shaving kit. The Supreme Court of the United States has held that a warrantless search is lawful when it is based upon the consent of a third party who the police reasonably believe has common authority over the items to be searched, but who in fact does not have such authority. *Illinois v. Rodriguez*, 497 U.S. 177, 186 (1990). Our own Supreme Court has described this "apparent authority exception" to the Fourth Amendment's warrant requirement as follows:

> A third party with apparent authority over the area to be searched may provide police with consent to search. Third party consent is valid when police reasonably believe a third party has authority to consent. Specifically, the apparent authority exception turns on whether the facts available to police at the moment would lead a person of reasonable caution to believe the consenting third party had authority over the premises. If the person asserting authority to consent did not have such authority, that mistake is constitutionally excusable if police reasonably believed the consenter had such authority and police acted on facts leading sensibly to their conclusions of probability.

*Commonwealth v. Strader*, 931 A.2d 630, 634 (Pa. 2007) (citations omitted).

In *Commonwealth v. Blair*, 575 A.2d 593, 598 (Pa. Super. 1990), we elucidated the narrow confines of the apparent authority exception.

> [W]e are not allowing carte blanche consent entries into residences with the police officer being able to ratify his entry at a later date suppression hearing by merely stating that he was mistaken as to the actual authority of the consenting party. We hold that the police officer's reasonable mistake must be judged from an objective standard based on the totality of the

- 13 -

circumstances. Although the police officer's state of mind is one factor to be considered in determining the reasonability of the mistake, it is not the only factor. Moreover, the police officer's mistake must be reasonable. In ambiguous situations, those situations which would cause a reasonable person to question the consenting party's actual authority or if the consenting party's assertions of authority appear unreasonable, a police officer should make further inquiries to determine the status of the consenting party. Reliance on a third party's bald assertion in such situations could subject any search to the remedy of the exclusionary rule.

*Id.* (footnote omitted).

Viewing the instant matter in light of these principles, the Commonwealth's attempt to show the legitimacy of Smith's consent falls short. The facts known to the police at the time of the search were such that an objectively reasonable officer would have concluded that Smith did not have authority to consent to the search of Perel's baggage. Indeed, Captain Jewell, at the suppression hearing, candidly described the search as follows:

**District Attorney:** After obtaining consent to search from [Smith,] what did you do next Captain?

**Captain Jewell:** I entered the apartment.

**District Attorney:** And you just walk in?

**Captain Jewell:** Because of the nature of the call, a gun involved, we cleared the apartment first to make sure no other persons were present and there were not.

**District Attorney:** Okay. And you searched the apartment?

**Captain Jewell:** Yes sir.

**District Attorney:** And what does that entail?

- 14 -

**Captain Jewell:** I ended up going to the back bedroom as part of the clearing. After I cleared it, I immediately saw a small bag, shaving bag, on the foot of the bed.

**District Attorney:** And what was it—when you observed it, what did you immediately notice?

**Captain Jewell:** It fit the description of what the victim had told me.

**District Attorney:** Okay. And what did you do next?

**Captain Jewell:** I opened it.

* * *

**Captain Jewell:** I did see two pieces of luggage on the bed containing men's clothing.

**District Attorney:** And did you search the luggage?

**Captain Jewell:** I looked through the luggage and I found a slip, a hotel receipt in the name of [Perel.]

N.T.S. at 48-49.

Based upon the totality of the circumstances, it was unreasonable for Captain Jewell to believe that Smith had the authority to consent to a search of a **men's** shaving bag or the two other pieces of luggage lying beside it. These items, as a matter of common sense, necessarily command a high expectation of privacy.[8] The Commonwealth does not contend that Smith

_____

[8] *See* 3 W. LaFave, Search and Seizure, § 8.5(d), at 307 (2d ed. 1987) ("Among the articles which it would seem would most commonly be deserving of the 'high expectation of privacy' label in the host-guest context would be the overnight bag or suitcase."); *United States v. Wilson*, 536 F.2d 883 (9th Cir. 1976) (holding that a homeowner's consent to search a guest's suitcase was invalid), *cert. denied*, 429 U.S. 982 (1976); *cf. United States v. Sealey*, 830 F.2d 1028 (9th Cir. 1987) (holding that boxes and plastic buckets are not containers that are commonly used to preserve
*(Footnote Continued Next Page)*

carried either item on her person. There were no markings, tags, or other inscriptions to suggest that Smith had joint access to, or co-ownership of, Perel's baggage. Under these circumstances, it belies common sense to infer that Smith had the authority to use, access, or control Perel's suitcase and shaving kit.

Furthermore, the police were acting in response to a report that **Perel himself** had brandished a leather shaving bag in the course of a robbery. According to Holcomb, Perel carried the leather shaving bag, with a black firearm concealed therein, into an apartment building on Parke Drive. After the police found and arrested Perel, Smith signed a written consent to search her apartment, which was located at 1420 Parke Drive. Among the items that officers listed on the consent form were a black handgun and a black or brown leather shaving bag. All of these facts, which the police knew at the time of the search, render any belief that Smith had authority to consent to a search of Perel's property objectively unreasonable. Thus, the warrantless inspection of the contents within Perel's luggage and shaving kit can not be justified as a lawful consent search.[9]

*(Footnote Continued)* ─────────────────

privacy and therefore the defendant's girlfriend's consent to search them was valid).

[9] Although not binding upon us, our conclusion is supported by several Federal courts of appeals that have considered the apparent authority exception in factually analogous cases. *United States v. Welch*, 4 F.3d 761 (9th Cir. 1993) (holding that officers had no reasonable basis to believe that the defendant's boyfriend's control over her purse meant that he had
*(Footnote Continued Next Page)*

Having determined that the instant search was unconstitutional, we now must address the learned Dissent's contention that the evidence should not be suppressed because of the doctrine of inevitable discovery. According to the Dissent, the facts of this case do not merit application of the exclusionary rule because "there was ample evidence to establish probable cause in support of a warrant to search the contents of the shaving kit." Dis. Op. at 13 (footnote omitted).

The Supreme Court of the United States announced the inevitable discovery exception to the exclusionary rule in **Nix v. Williams**, 467 U.S. 431 (1984). The **Nix** Court held that the fruits of an unconstitutional search are admissible where "the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." **Id.** at 444. However, due to the concomitant protections afforded by Article I, Section 8 of the Pennsylvania Constitution,[10] our inevitable discovery jurisprudence does not mirror its

*(Footnote Continued)* _____

actual or apparent authority to consent to a search of it); **United States v. Salinas-Cano**, 959 F.2d 861, 864, (10th Cir. 1992) (holding that defendant's girlfriend did not have apparent authority to consent to the search of his luggage because a reasonable person would have known that people generally retain a high expectation of privacy in closed suitcases).

[10] The Pennsylvania Constitution provides:

The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor

*(Footnote Continued Next Page)*

federal counterpart. ***Commonwealth v. Mason***, 637 A.2d 251, 256 (Pa. 1993). Our Supreme Court has explained this disparity as follows:

> If our sole purpose in applying Article I, Section 8 to the facts of this case were to deter police misconduct, we would be constrained to rule in favor of the Commonwealth, for in balancing the interests, it is apparent that society's interest in arresting those guilty of serious crime should not be thwarted where police would inevitably and independently arrive at the same evidence, but for their illegal conduct. However, where our task is not merely to deter police misconduct, but also to safeguard privacy and the requirement that warrants shall be issued only upon probable cause, our conclusion is different.

*Id.* at 256.

In ***Commonwealth v. Berkheimer***, 57 A.3d 171 (Pa. Super. 2012) (*en banc*), we discussed extensively the doctrine of inevitable discovery. In that case, the appellant's stepfather, knowing that the appellant was wanted on a probation detainer, provided the Pennsylvania State Police with information regarding the appellant's whereabouts. *Id.* at 174. When the police arrived at the address provided to them by the appellant's stepfather, they detected an odor of burnt marijuana wafting from the residence. *Id.* at 174-75. The officers entered into the home despite the fact that they did not have a warrant to do so. *Id.* at 175. Once inside, officers observed numerous glass marijuana pipes, a plastic bag and a pill bottle containing

(Footnote Continued) ————————————

> without probable cause, supported by oath or affirmation subscribed to by the affiant.

Pa. Const. art. I, § 8.

marijuana, and several rounds of pistol ammunition. *Id.* The officers then secured a warrant to search the residence (based, at least in part, upon the items that they observed during the prior illegal entry into the home). *Id.* That search revealed three additional small bags of marijuana and a digital scale. *Id.* at 176.

Following his arrest, the appellant filed a motion to suppress all of the evidence seized by the police. The suppression court recognized that the troopers' search of the residence was unlawful, notwithstanding the belated issuance of a search warrant, but denied suppression. Specifically, the court reasoned that, because the smell of marijuana that the troopers detected provided probable cause for the issuance of a warrant, the evidence inevitably would have been discovered. *Id.* at 176 (citing *Nix v. Williams*, 467 U.S. 431 (1984)).

On appeal, an *en banc* panel of this Court rejected the suppression court's logic, and held that the lower court erred in failing to suppress the evidence that was obtained pursuant to the search warrant. The Court further held that, where law enforcement officers engage in apparent misconduct by negating the warrant requirement, the Commonwealth only can avoid suppression by demonstrating a source "truly independent from both the tainted evidence and the police or investigative team which

engaged in the misconduct." *Id.* (quoting **Commonwealth v. Mason**, 637 A.2d 251, 257-58 (Cappy, J. concurring)).[11]

Instantly, as in **Berkheimer**, the Commonwealth cannot satisfy these demanding requirements.[12] The record is devoid of any suggestion that there was an alternative justification that would have permitted Captain Jewell to open and inspect the contents of Perel's shaving kit. The Dissent misconstrues the doctrine of inevitable discovery as an invitation for appellate courts to overlook patently unconstitutional searches whenever the

_____

[11] The learned Dissent contends that **Berkheimer** is distinguishable from the instant case, largely based upon insignificant differences between the facts of the two cases. It is true that the facts of the instant case do not align perfectly with those from **Berkheimer**. However, we do not cite **Berkheimer** for its facts; rather, we cite that case for the indisputably applicable legal principle that emerged from that case and that is applicable here. The *en banc* panel of this Court in **Berkheimer** held that having probable cause to obtain a search warrant does not negate an otherwise illegal search. **Berkheimer**, 57 A.3d at 174 (holding that "the evidence seized was not subject to discovery by way of an independent source, and therefore is not purged of the taint of illegality"). In other words, the fact that police **could** have obtained a valid warrant (and, as the Dissent would hold, **would** have obtained a warrant), does not excuse constitutional errors, unless a truly independent source can be shown. A fair reading of **Berkheimer**, in which the *en banc* panel reviewed all of the leading cases in this area, demonstrates that the principle that possessing probable cause to obtain a warrant is insufficient to overcome illegal searches applies broadly to all search and seizure cases. **Berkheimer** simply is not as limited as the Dissent maintains, and can offer no support to the Dissent's position.

[12] Tellingly, the Commonwealth did not—either at the suppression hearing or before this Court—argue that the contents of Perel's shaving kit would inevitably have been discovered.

police *could* have complied with the Constitution's warrant requirement, but instead consciously disregarded it. Unsurprisingly, the Dissent cites no authority to support such a constitutionally infirm precept.[13] Far from a "discrete constitutional transgression," ***See*** Dis. Op. 13, the idea that law enforcement officers may obviate the need to secure a search warrant based upon their own determination that sufficient probable cause exists is antithetical to the Fourth Amendment. As stated by Justice Robert Jackson in ***Johnson v. United States***, 333 U.S. 10 (1948):

> The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those

_____

[13] Although the Dissent refers to the instant search as a "textbook" example of inevitable discovery, none of the cases that it cites stand for the proposition that the mere existence of probable cause is sufficient to justify application of the doctrine. ***See Commonwealth v. Van Winkle***, 880 A.2d 1280, 1285 (Pa. Super. 2005) (holding that the evidence in question would have inevitably been discovered when police conducted a full search incident to a lawful arrest); ***Commonwealth v. Ingram***, 814 A.2d 264, 272 (Pa. Super. 2002) (same); ***Commonwealth v. Hoffman***, 589 A.2d 737, 743, (Pa. Super. 1991) (same); ***Commonwealth v. Miller***, 724 A.2d 895, 899, n.5 (Pa. 1999) (stating in *dicta* that evidence would have been admissible based upon the inevitable discovery doctrine, but failing to elaborate); ***Commonwealth v. Albrecht***, 720 A.2d 693, 702 n. 11 (Pa. 1998) (holding that trial counsel was not ineffective for failing to file a suppression motion where firefighters entered appellant's home and where appellant consented to a subsequent search on the following day); ***Commonwealth v. Garcia***, 661 A.2d 1388, 1392, n.11 (Pa. Super. 1995) (holding that the appellant had waived his suppression issue on appeal, but stating in *dicta* that the contraband would inevitably have been discovered during a search incident to a lawful arrest); ***Commonwealth v. Speaks***, 505 A.2d 310, 313 (Pa. Super. 1986) (holding that, despite ***Miranda*** violation, discovery of evidence was inevitable where officers already had obtained a valid search warrant).

> inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime. Any assumption that evidence sufficient to support a magistrate's disinterested determination to issue a search warrant will justify the officers in making a search without a warrant would reduce the Amendment to a nullity[.]

*Id.* at 11 (footnote omitted).

To hold that courts simply may make a post-hoc determination that sufficient probable cause existed at the time of an otherwise illegal search would be to eliminate the key safeguard that "delineat[es] the dignity of the individual living in a free society." ***Commonwealth v. Edmunds***, 586 A.2d 887, 899 (Pa. 1991). Such an approach patently is at odds with the strong notions of privacy that are carefully safeguarded by Article I, Section 8 of the Pennsylvania Constitution. *Id.* ("[T]he exclusionary rule in Pennsylvania has consistently served to bolster the twin aims of Article I, Section 8; to-wit, the safeguarding of privacy and the fundamental requirement that warrants shall only be issued upon probable cause.").

Stated simply, the inevitable discovery doctrine is not a substitute for the warrant requirement. Police must demonstrate that the evidence **would** have been discovered absent the police misconduct, not simply that they somehow **could** have lawfully discovered it. Instantly, the record is devoid of any suggestion that, absent Captain Jewell's unconstitutional search of Perel's shaving kit, the items would have been discovered. To hold otherwise, as the Dissent would do, would eradicate the need for police officers ever to obtain a constitutionally supported search warrant. Under

the Dissent's view, police only need to seize the item or search the premises and then invoke the inevitable discovery doctrine with the assertion that they "could have obtained a warrant." The inevitable discovery doctrine does not operate in such a constitutionally impoverished manner.

Because Perel had a reasonable expectation of privacy in his luggage and shaving kit, and because Smith could not validly consent to a search of those items and it was unreasonable for the police to believe that she possessed the authority to do so, the trial court erred in concluding that Smith lawfully consented to the warrantless search of Perel's private closed containers. Moreover, the search of Perel's belongings does not fall within the narrow confines of the inevitable discovery doctrine. Accordingly, we vacate Perel's judgment of sentence, order that the evidence subject to Perel's motion be suppressed, and remand for a new trial.[14]

Judgment of sentence vacated. Case remanded for further proceedings consistent with this opinion. Jurisdiction relinquished.

_____

[14] We note that, in his suppression motion, Perel challenged both the search of his shaving kit (which contained a firearm, ammunition, and three packets of marijuana) and the seizure of marijuana from his person at the time of his arrest. Nevertheless, because Perel pleaded guilty to possession with intent to deliver, he has waived all non-jurisdictional claims relating to that offense except for the voluntariness of his plea and the legality of his sentence. *Commonwealth v. Lincoln*, 72 A.3d 606, 609 (Pa. Super. 2013). Hence, our conclusion that the trial court erred in denying Perel's motion to suppress evidence does not affect his guilty plea to possession with intent to distribute.

Judge Panella joins the opinion.

Judge Olson files a dissenting opinion.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/23/2014