J-A19044-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| PEDRO J. CONTES | : | No. 243 MDA 2024 |

Appeal from the Order Entered January 16, 2024
In the Court of Common Pleas of Columbia County Criminal Division at
No(s):  CP-19-CR-0000583-2023

BEFORE:   PANELLA, P.J.E., LANE, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY LANE, J.:                    **FILED: FEBRUARY 14, 2025**

The Commonwealth appeals from the order suppressing its evidence against Pedro J. Contes ("Contes").  For the following reasons, we affirm the suppression court's order.

The suppression court set forth the facts of this case as follows:

> A hearing on the motion [to suppress] was conducted on December 20, 2023.  The only witness presented by the Commonwealth was Officer Philip Mainiero [("Officer Mainiero")]. Officer Mainiero testified that [Contes'] residence [in Berwick, Columbia County, Pennsylvania] was under video surveillance on June 30, 2023 and that Officer Mainiero was reviewing that surveillance in his office at the [Berwick] police station that morning.  Via that video feed, Officer Mainiero observed a person . . . with [Contes on the back porch] exchange something in a

---

[*] Former Justice specially assigned to the Superior Court.

"hand-to-hand" exchange.[1]  Officer Mainiero was unable to independently verify that the items exchanged were drugs and money, or anything else for that matter.

[Ten hours later] in the day on June 30, 2023, according to Officer Mainiero's hearsay statements, [Contes'] vehicle was stopped [in Nescopeck, Luzerne County,[2]] by agents of the Pennsylvania State Police (["]PSP["]) and the federal Drug Enforcement Agency (["]DEA["]).  No agent from PSP or DEA testified at the hearing on [Contes' suppression] motion.  . . .

For his part, [Contes] testified that he was returning home from work on June 30, 2023 when a PSP trooper pulled him over. The PSP trooper had a visible weapon and was in uniform.  Two more unmarked vehicles arrived shortly out of which exited the DEA agents.  [Contes] testified that [although the PSP trooper told him he drove through a stop sign,] he did not run a stop sign and there was no evidence of any vehicle violation occurring or criminal activity being afoot.  [Contes] was asked to exit his vehicle and stand in front of the PSP vehicle.  The DEA agent(s) searched [Contes'] vehicle without a warrant and without [Contes'] consent . . ..  In addition to PSP and DEA agents, [a Federal Bureau of Investigation ("FBI")] agent was . . . present. They were all armed.  . . .

Opinion and Order, 1/16/24, at 1-3 (footnote, citation, and unnecessary capitalization omitted).

Contes further testified that "[w]hen he exited his vehicle, [he] was told to place his cell phone on top of his vehicle."  *Id*. at 3.  "The trooper and

---

[1] The suppression court stated that Officer Mainiero "observed a person . . . go into [Contes'] home [and] relatively quickly come out with [Contes]." Opinion and Order, 1/16/24, at 2.  However, our review of the record did not reveal these facts.

[2] Although the suppression court stated that the vehicle stop occurred in "Berwick," Contes' undisputed testimony was that the stop occurred in Nescopeck.  **Compare** Opinion and Order, 1/16/24, at 2, **with** N.T., 12/20/23, at 45.

agents then 'asked' [Contes] to follow them to the Berwick Police station," and Contes complied. *Id*. (unnecessary capitalization omitted). Contes "was never told at the scene that he was free to leave," and "[a]t no point . . . at the scene, on the drive to the station[, or] while at the station[] did [he] feel that he was free to leave." *Id*.

Finally, Officer Mainiero testified that his

> first personal contact with [Contes] occurred after the stop, and after the PSP and DEA agents "asked" [Contes] to follow them to the Berwick [p]olice [s]tation to answer some questions. Officer Mainiero first saw [Contes] in person when he arrived at the [p]olice [s]tation with the PSP and DEA agents.

*Id*. at 2.

From the certified record, we derive the following additional relevant factual and procedural history. At the suppression hearing, the Commonwealth's sole witness, Officer Mainiero, testified to all of the following. He suspected Contes and the unknown individual to have conducted a drug sale at Contes' residence on the morning of June 30, 2023. *See* N.T., 12/20/23, at 6. Officer Mainiero did not observe Contes' home or the transaction in person; rather, he viewed it remotely on video from his office. *See id*. at 37. Furthermore, Officer Mainiero participated in a six-month investigation, coordinated between the Berwick Police department, PSP, and DEA, of Contes allegedly making drug deliveries. *See id*. at 5-6, 35, 39. The investigation included two controlled drug buys with confidential informants ("CIs") and surveillance of Contes and his residence. *See id*. at 6, 36. Officer

- 3 -

Mainiero stated that he could not "recall the date" of the most recent controlled buy, and he did not testify to the date of the first alleged controlled buy. *Id*. Furthermore, Officer Mainiero did not provide any information about these suspected drug transactions or the CIs, including whether the police searched the CIs before or after the interactions, provided them with pre-recorded money, or stopped them or recovered drugs from them after the interactions. Finally, authorities did not charge Contes for any of the alleged controlled buys or the alleged drug sale on the morning of June 30, 2023. *See id*. at 6-7.

Officer Mainiero testified that during the morning of June 30, 2023, Contes exited his house and went to work, at which time DEA agents followed him. *See* N.T., 12/20/23, at 38-39. He testified that "DEA [agents were] stationed outside of [Contes'] work," although Officer Mainiero did not know "how long they stayed outside." *Id*. at 39.

Contes testified to the following. At 4:45 p.m. later that day, he left work and approximately twenty minutes into his drive home, a PSP trooper initiated the traffic stop and stated that he had driven through a stop sign. *See id*. at 45-47. The PSP trooper was in uniform and had a visible weapon holstered. *See id*. at 47. Two to three minutes after the PSP trooper initiated the traffic stop, two unmarked vehicles arrived on scene. *See id*. A female DEA agent showed Contes her badge and had a visible weapon holstered. *See id*. at 47-48. An FBI agent had also arrived. *See id*. at 50.

The PSP trooper did not cite Contes at the scene for a stop sign violation, nor did Contes subsequently receive a traffic citation in the mail. ***See*** N.T., 12/20/23, at 47. During the traffic stop, officers removed Contes from his vehicle and the PSP trooper searched him. ***See id***. at 49. In addition, the DEA agent searched the interior and the trunk of his vehicle. ***See id***. The officers did not present Contes with a search warrant, nor did Contes give a written or verbal consent to search his vehicle. ***See id***. at 50-51.

At the time of the vehicle stop, there was no active warrant for Contes' arrest, related to the sale of narcotics or any other offense. ***See*** N.T., 12/20/23, at 39. Officer Mainiero plainly testified that the law enforcement agencies' goal and purpose for the stop was to speak with Contes about his alleged role in selling narcotics, to obtain his cooperation, and to "utilize him as an informant and extract information from him." ***Id***. at 21-22, 30, 39.

As stated above, when the officers removed Contes from his vehicle, they directed him to put his phone on top of his car. ***See id***. at 51. Contes further testified that the officers did not return his phone to him at the conclusion of the vehicle stop, but "directed" him to drive to the Berwick Police station, which was across the county line, while they followed him in their unmarked vehicles. ***Id***. at 51-52. During the ten-minute drive to the police station, Contes felt that he was not free to leave nor to go home. ***See id***. at 52. When Contes arrived at the Berwick Police station, Officer Mainiero and two DEA agents escorted him to an interview room that they accessed through

locked doors. *See id*. at 14-17, 40. Once inside the interview room with the three officers, Contes felt like he was not free to leave the police station or go home, and no one told him he could do so. *See id*. at 56.

Officer Mainiero and the two DEA agents advised Contes of his *Miranda*[3] rights. *See* N.T., 12/20/23, at 16-17, 55. During the interview, Contes signed a *Miranda* waiver, and made various incriminating statements. *See id*. at 18-21. Contes also gave the police written consent to search his residence. *See id*. at 21. Officer Mainiero and the female DEA agent then immediately drove Contes to his house in an unmarked vehicle. *See id*. at 24. According to Officer Mainiero, he waited for a male DEA agent to arrive because Contes did not want the female DEA agent inside of his house. *See id*. at 24-25. Once the male DEA agent arrived, they searched Contes' residence, and found several bags of cocaine and drug paraphernalia, including a digital scale. *See id*. at 24-26.

After seizing the contraband, Officer Mainiero and the DEA agents transported Contes back to the police station and talked with him further about potentially cooperating as a confidential informant. *See id*. at 29-30. Contes would not agree to consent to the search of his cell phone and asked for a couple days to think about cooperating. *See id*. at 30. At that time, Officer

---

[3] *Miranda v. Arizona*, 384 U.S. 436 (1966).

Maneiro "seized" Contes' cellphone and allowed him to leave the police station, but they agreed to meet in a few days. *Id*. at 30-31.

One week later, on July 6, 2023, Officer Mainiero obtained a search warrant for Contes' residence when Contes did not contact him. *See* N.T., 12/20/23, at 31-32. At the same time, Officer Mainiero charged Contes with possession with intent to deliver a controlled substance, possession of a controlled substance, and possession of drug paraphernalia,[4] based on the evidence seized at his home. *See id*.

Contes filed a pre-trial motion to suppress the incriminating statements he made to the police and the physical evidence obtained during the search of his residence. Contes contended that because the officers subjected him to an illegal vehicle stop and seizure, his subsequent waiver of *Miranda* and consent to the search of his home were invalid.

During the suppression hearing on December 20, 2023, the trial court stated that it found that Contes' *Miranda* waiver and consent to search his residence were knowing and voluntary. However, on January 16, 2024, after reviewing the parties' briefs, the suppression court reversed its decision and granted Contes' motion, issuing findings of fact and conclusions of law. The suppression court found Contes' testimony at the suppression hearing was credible. *See* Opinion and Order, 1/16/24, at 3. The suppression court

---

[4] *See* 35 P.S. § 780-113(a)(30), (16), (32).

concluded: (1) the officers lacked reasonable suspicion to stop Contes' vehicle; (2) the officers also lacked probable cause to detain him when they requested that he follow them to the police station; and thus (3) the ensuing incriminating statements and evidence recovered from his home were "fruit of th[e] poisonous tree." *Id*. at 4.

The Commonwealth filed a timely notice of appeal.[5]    Both the Commonwealth and the suppression court complied with Pa.R.A.P. 1925.

The Commonwealth presents two issues for our review:

1. Did the trial court err in reversing its own finding of fact entered on the record during the suppression hearing, namely, that [Contes'] ***Mirandized*** statements to the police and written consent to search his residence were voluntary?

2. Did the trial court err in finding in its written opinion and order that [Contes'] statements to the police and consent to search his residence must be suppressed as "fruit of the poisonous tree" due to preceding events?

Commonwealth's Brief at 7.

Preliminarily, we note that in the argument section of its brief, the Commonwealth claims that "[d]ue to the months-long investigation of" Contes, the police "had sufficient evidence" for a search warrant and would have inevitably discovered the contraband in Contes' residence without relying on the admissions and consent he provided.  Commonwealth's Brief at 11.

---

[5] The Commonwealth certified in its notice of appeal that the suppression order will terminate or substantially handicap its prosecution.  ***See*** Pa.R.A.P. 311(d).

However, the Commonwealth did not preserve an inevitable discovery issue by including it in its court-ordered Pa.R.A.P. 1925(b) statement of errors. The suppression court's 1925(b) order specified: "Any issue not properly included in the Statement, timely filed and served pursuant to Pa.R.A.P. 1925(b), shall be deemed waived." Order, 2/16/24. The Commonwealth's Rule 1925(b) statement was identical to the above statement of questions involved, and merely raised the voluntariness of Contes' statements and consent to search his home, and the suppression court's finding that the evidence was "fruit of the poisonous tree."

Since the Commonwealth did not include any claim pertaining to the inevitable discovery doctrine, we conclude it has waived this issue for our review. **See** Pa.R.A.P. 1925(b)(4)(vii) (stating that "[i]ssues not included in the Statement and/or not raised in accordance with the provisions of this paragraph (b)(4) are waived"); **see also Commonwealth v. Proctor**, 156 A.3d 261, 267 (Pa. Super. 2017) (explaining that "[i]t is well-settled that issues that are not set forth in an appellant's statement of matters complained of on appeal are deemed waived") (citation, quotation marks, and brackets omitted).

We address the Commonwealth's remaining arguments, properly preserved, together. The Commonwealth maintains that the suppression court erred by granting Contes' motion to suppress because: (1) the police lawfully stopped Contes' vehicle; (2) when this investigatory detention ended,

Contes voluntarily went to the police station; and (3) Contes knowingly and voluntarily signed a *Miranda* waiver and consent to a search of his residence, when he was not in custody, curing any flaw that may have been present in the initial traffic stop.

When reviewing the grant of a suppression motion,

[w]e consider only the evidence from the defendant's witnesses together with the evidence of the prosecution that, when read in the context of the entire record, remains uncontradicted. This Court must first determine whether the record supports the factual findings of the suppression court and then determine the reasonableness of the inferences and legal conclusions drawn from those findings. In appeals where there is no meaningful dispute of fact, . . . our duty is to determine whether the suppression court properly applied the law to the facts of the case.

*Commonwealth v. Banks*, 165 A.3d 976, 979 (Pa. Super. 2017) (citation omitted).

"It is within the suppression court's sole province as factfinder to pass on the credibility of witnesses and the weight to be given to their testimony. The suppression court is free to believe all, some or none of the evidence presented at the suppression hearing." *Commonwealth v. Byrd*, 185 A.3d 1015, 1019 (Pa. Super. 2018) (citation omitted).

Both the United States and Pennsylvania Constitutions protect individuals from unreasonable searches and seizures. *See Commonwealth v. Bostick*, 958 A.2d 543, 550 (Pa. Super. 2008). Absent an applicable exception, police must have a warrant based on probable cause before they

may conduct a search for or seize evidence. *See Commonwealth v. Heidelberg*, 267 A.3d 492, 502 (Pa. Super. 2021) (*en banc*).

"To secure the right of citizens to be free from unreasonable search and seizure, courts in Pennsylvania require law enforcement officers to demonstrate ascending levels of suspicion to justify their interactions with citizens to the extent those interactions compromise individual liberty." *Commonwealth v. Hampton*, 204 A.3d 452, 456 (Pa. Super. 2019). We have long recognized three types of interactions that occur between law enforcement and private citizens:

> a mere encounter, an investigative detention, and a custodial detention. A mere encounter is characterized by limited police presence, and police conduct and questions that are not suggestive of coercion. Such encounters do not obligate the citizen to stop or respond and, consequently, need not be supported by any level of suspicion. Thus, the hallmark of a mere encounter is that the subject is free to decline to interact with the police or to answer questions, and is also free to leave at any time.
>
> If, however, a police presence becomes too intrusive, the interaction must be deemed an investigative detention or seizure. An investigative detention, by implication, carries an official compulsion to stop and respond. Since this interaction has elements of official compulsion it must be supported by a reasonable and articulable suspicion that the person seized is engaged in criminal activity and may continue only so long as is necessary to confirm or dispel such suspicion.
>
> Finally, an arrest or custodial detention must be supported by probable cause to believe the person is engaged in criminal activity.

*Id*. at 456-57 (citations omitted and paragraph break added).

This Court has explained:

- 11 -

Probable cause is made out when the facts and circumstances which are within the knowledge of the officer at the time of the [stop], and of which he has reasonably trustworthy information, are sufficient to warrant a man of reasonable caution in the belief that the suspect has committed or is committing a crime. The question we ask is not whether the officer's belief was correct or more likely true than false. Rather, we require only a **probability**, and not a **prima facie** showing, of criminal activity. In determining whether probable cause exists, we apply a totality of the circumstances test.

**Byrd**, 185 A.3d at 1023-24 (citation omitted) (emphases in original).

Additionally:

To decide whether a seizure has occurred, a court must consider all the circumstances surrounding the encounter to determine whether the demeanor and conduct of the police would have communicated to a reasonable person that he or she was not free to decline the officer's request or otherwise terminate the encounter. A variety of factors may influence this determination, including "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." As our High Court has explained, "subtle factors as the demeanor of the police officer, the location of the confrontation, the manner of expression used by the officer in addressing the citizen, and the content of the interrogatories or statements" must be considered. An additional factor is whether the police officer physically prevents the citizen from leaving. Thus, the focal point of our inquiry must be whether, considering the circumstances surrounding the incident, a reasonable person would have thought he was being restrained had he been in the defendant's shoes.

**Hampton**, 204 A.3d at 457 (citations omitted).

A vehicle **stop** must be justified by reasonable suspicion that the driver has committed a violation of the Vehicle Code or that criminal activity is afoot. **See Commonwealth v. Feczko**, 10 A.3d 1285, 1291 (Pa. Super. 2010) (*en banc*) (emphasis added); **see also** 75 Pa.C.S.A. § 6308(b) (authorizing police

to stop a vehicle when there is reasonable suspicion that a Vehicle Code violation has occurred). As a general rule, a warrantless **search** of a vehicle requires both probable cause and exigent circumstances; "one without the other is insufficient." **Commonwealth v. Alexander**, 243 A.3d 177, 207 (Pa. 2020) (emphasis added).

It is well settled that when an individual is "both taken into custody and subjected to interrogation," they are entitled to **Miranda** warnings. **Commonwealth v. Yandamuri**, 159 A.3d 503, 520 (Pa. 2017). Our Supreme Court has explained that, pursuant to **Miranda**:

> [B]efore law enforcement officers question an individual who has been in taken into custody or has been deprived of his freedom in any significant way, the officers must first warn the individual that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed. . . .

**Id**. at 520-21 (*citing* **Miranda**, 384 U.S. at 478-79).

"Evidence constitutes fruit of the poisonous tree, and must be suppressed, if it was obtained by 'exploitation' of [an illegal seizure], and so long as the taint of that illegality has not been purged." **Commonwealth v. Shabezz**, 166 A.3d 278, 290 (Pa. 2017) (citation omitted). This Court has noted "traditional circumstances [that have purged a taint of an unconstitutional act include:] attenuation, inevitable discovery, independent source, or some intervening act or event." **Id**. at 291 (citation omitted).

However, "the fruits of an unconstitutional search are admissible where 'the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means.'" ***Commonwealth v. Perel***, 107 A.3d 185, 194 (Pa. Super. 2014) (citation omitted).[6] "The purpose of the inevitable discovery rule is to block setting aside convictions that would have been obtained without police misconduct." ***Commonwealth v. King***, 259 A.3d 511, 522 (Pa. Super. 2021) (citation omitted). This Court has cautioned, however, that "the inevitable discovery doctrine is not a substitute for the warrant requirement[, and the Commonwealth] must demonstrate that the evidence ***would*** have been discovered absent the police misconduct, not simply that [law enforcement] somehow ***could*** have lawfully discovered it." ***Perel***, 107 A.3d at 196 (emphases in original). This Court reiterated that when law enforcement officers obtain evidence through apparent misconduct, "the Commonwealth only can avoid suppression by demonstrating a source truly independent from both the tainted evidence and the police or investigative team which engaged in the misconduct." ***Id***. at 195 (citation and quotation marks omitted). Simply stated, the inevitable discovery doctrine requires a showing of a truly independent, lawful path to discovery of the evidence.

---

[6] Black's Law Dictionary defines the term "inevitable" as, *inter alia*, that which is "incapable of being avoided." BLACK'S LAW DICTIONARY 698 (5th ed. 1979).

In the instant appeal, the Commonwealth acknowledges that the suppression "court found that it believed [Contes'] claim that he had not committed any traffic violation and therefore the initial traffic stop by the [PSP trooper] was unlawful." Commonwealth's Brief at 12. However, the Commonwealth insists that "at the time of the stop, the officers already had probable cause to believe that [Contes] had been engaged in unlawful activity based on the prior investigation and observations from that very morning." *Id*. at 12-13. On that basis, the Commonwealth claims that: (1) the PSP trooper properly conducted a brief investigatory stop; (2) this "investigative detention" ended when Contes "reentered his vehicle to drive away;" and (3) Contes then "voluntarily appeared at the Berwick Police station and was never in custody again that day." *Id*. at 13.

The Commonwealth further contends that Contes knowingly and voluntarily signed a *Miranda* waiver and consented to a search of his residence "when he was not in custody," thereby curing "any flaw that may have existed in the initial traffic stop." *Id*. Finally, the Commonwealth argues that Officer Mainiero's observations of Contes during the months-long investigation, allegedly involving two drug transactions with CIs, along with the alleged drug transaction on the morning of the stop, provided the police with "sufficient evidence to obtain a search warrant for [Contes'] residence regardless of his consent." *Id*. at 11, 15. Thus, the Commonwealth

maintains, the police would have inevitably discovered the contraband in his residence "without reliance on [Contes'] admissions and consent."[7] *Id*. at 11.

The suppression court first found: (1) Contes "unrebutted testimony" was credible; (2) although Officer Mainiero testified that he observed Contes on a video making a "hand-to-hand" exchange, Officer Mainiero was "unable to independently verify that the items exchanged were drugs and money, or anything else for that matter;" (3) the observation of this back porch-exchange did "not provide probable cause to believe that a crime occurred at [Contes'] back porch on the morning of June 30, 2023, and thus would not justify a search warrant;" and (4) based on Officer Mainiero's testimony alone, "it was not inevitable that a search warrant would have been obtained and that the police would have found the contraband had [Contes'] rights been properly accommodated." Opinion and Order, 1/16/24, at 2-3.

Second, the suppression court concluded that there was "no evidence of a traffic violation or a crime" at the time the DEA agents and PSP trooper stopped Contes' vehicle. *Id*. at 3. Third, the suppression court opined that the warrantless search of Contes' vehicle was unlawful because the police did not have the probable cause required under *Alexander*, 243 A.3d 177. *See id*. at 2. Fourth, the suppression court determined that the police could not lawfully "ask[]" Contes to follow them to the Berwick Police station. *See id*.

---

[7] As stated above, we determine the Commonwealth has waived an inevitable discovery claim.

at 3. Fifth, the suppression court found that Contes subsequent **Miranda** waiver and consent to search were involuntary and did "not purge the taint of the illegal stop[,]" and thus "[a]ll evidence derived as a fruit of that poisonous tree must be suppressed." **Id**. at 4.

Finally, the suppression court, as the factfinder, rejected the Commonwealth's contention that police would have inevitably discovered the evidence seized from Contes' residence. The suppression court specifically found that the police lacked probable cause to secure a search warrant of Contes' residence independently of the police misconduct because the Commonwealth provided no evidence that Contes committed a crime. **See** Opinion and Order, 1/16/24, at 3.

After reviewing the entire record and relevant caselaw in this matter, we conclude that the record supports the suppression court's legal conclusions and uncontradicted factual findings. First, we agree with the suppression court's finding that Officer Mainiero's mere observation, of the video of Contes and an unidentified person allegedly making a hand-to-hand exchange, did not establish probable cause to believe that a crime occurred, and thus "would not justify a search warrant." **See** Opinion and Order, 1/16/24, at 3. Officer Mainiero did not observe this transaction firsthand, but rather on a video. Saliently, Officer Mainiero could not say "that the items exchanged were drugs and money, or anything else for that matter." **Id**. at 2.

Second, we conclude Officer Mainiero's above observation did not provide the reasonable suspicion necessary to justify the vehicle stop of Contes. *See Feczko*, 10 A.3d at 1291 (stating that a vehicle stop must be based on reasonable suspicion of a Motor Vehicle Code violation or criminal activity afoot). We conclude the Commonwealth failed to provide any evidence that Contes committed a crime or a Vehicle Code violation. *See* N.T., 12/20/23, at 39-40; *see also* Opinion and Order, 1/16/24, at 2. Officer Mainiero admitted in his testimony that the police conducted the vehicle stop, ten hours after Contes allegedly made a hand-to-hand transaction in another location, to speak to Contes about his involvement in selling narcotics, gain his cooperation, and potentially utilize him as an informant. Officer Mainiero made no mention of any alleged stop sign violation. Instead, Officer Mainiero testified that "it was a coordinated effort between [the Berwick Police] department, the DEA and PSP." N.T. 12/30/24, at 39. The purported basis for the stop was a drug transaction that Officer Mainiero had allegedly viewed earlier that morning from his office through video surveillance. However, as the suppression court found, this was speculation on Officer Mainiero's part, as there was no evidence that he or any other officer seized the items allegedly exchanged, had them tested, or stopped the other individual. *See* Opinion and Order, 1/16/24, at 2 (stating that "Officer Mainiero was unable to independently verify that the items . . . were drugs and money, or anything else for that matter"). Officer Mainiero testified that Contes was allegedly

involved in two previous controlled buys, but he did not provide any additional information about either alleged transaction and could not recall when the most recent one occurred. Furthermore, Officer Mainiero provided no additional information about these suspected drug transactions or the CIs, including whether the police searched the CIs before or after the interactions, provided them with pre-recorded money, or stopped them or recovered drugs from them after the interactions. Officer Mainiero provided no indication, as the Commonwealth argues, that the officers stopped Contes' vehicle because they believed he committed a traffic violation or there was criminal activity afoot **at the time of the stop**. **See** N.T., 12/20/23, at 21-22, 39-40 (emphasis added).

Third, even though the Commonwealth does not address the warrantless search of Contes' person and vehicle at the scene, we agree with suppression court that both were unlawful.[8] As the record reflects, two minutes after the PSP trooper stopped Contes, two more unmarked vehicles arrived, out of which exited the armed DEA and FBI agents. The Commonwealth offered no explanation why DEA and FBI agents, in separate vehicles, would so quickly appear on the scene for an alleged routine stop sign violation, and participate in a search of Contes' car. Instead, as stated above,

---

[8] We note, however, that the Commonwealth did not present any evidence recovered from this search of Contes and his vehicle.

Officer Mainiero admitted this stop was part of a preplanned, coordinated effort between the Berwick Police department, PSP, and DEA.

The DEA agent did not present Contes with any search warrants at the scene, nor did he give consent for the search of his vehicle. As the suppression court reasoned,

> It cannot be said that the search was incident to arrest or a safety search within [Contes'] wingspan, as, according to Officer Mainiero, [Contes] was not under arrest and the interior of [Contes'] vehicle was not within his wingspan when he was outside the vehicle standing in front of the PSP cruiser. . . .

Opinion and Order, 1/16/24, at 3. Furthermore, the Commonwealth did not allege any exigent circumstances, which is required, in addition to probable cause, for a warrantless search of a car. *See Alexander*, 243 A.3d at 207.

Fourth, we conclude that when the officers purportedly requested Contes to follow them to the police station, across county lines, the encounter escalated to a detainment, for which the officers lacked probable cause. *See Hampton*, 204 A.3d at 456-57. While the Commonwealth asserts that Contes was not in *custody*, it fails to cite any authority to support its position. Instead, the Commonwealth generally cites to *Terry v. Ohio*, 391 U.S. 1 (1968), to support its position that the *traffic stop* was lawful.

At the suppression hearing, the Commonwealth did not present the testimony of any members of law enforcement involved in the traffic stop of Contes. Rather, Officer Mainiero testified that the purpose of the illegal traffic stop was so that police could speak to Contes about his alleged role in selling

narcotics, to obtain his cooperation, and to possibly utilize him as an informant. *See* N.T., 12/20/23, at 21-22. The suppression court found:

> In addition to PSP and DEA agents, an FBI agent was . . . present. They were all armed. [Contes] was never told at the scene that he was free to leave and he felt as though he was not free to leave. . . .
>
> When he exited his vehicle, [Contes] was told to place his cell phone on top of his vehicle. The DEA agent told [Contes] that she was going to keep the phone to "make sure you show up" at the police station.

Opinion and Order, 1/16/24, at 3. Although Contes drove in his own vehicle, the police followed Contes to the station and Officer Mainiero was waiting for him in the parking lot of the Berwick Police station. "At no point, whether at the scene, on the drive to the station and while at the station, did [Contes] feel that he was free to leave." *Id*. Based on the forgoing, undisputed totality of the circumstances, including the officers' withholding of Contes' phone, we agree with the suppression court that a reasonable person in his position "would have thought he was being restrained." *Hampton*, 204 A.3d at 457. Thus, we conclude that, contrary to the Commonwealth's argument, Contes remained in custody.

Accordingly, the next issue to resolve is whether the officers had probable cause to support this detention. Consistent with our above discussion, we conclude that, under the totality of the circumstances, Officer Mainiero's mere observation, of an alleged hand-to-hand transaction of unknown objects with an unidentified person, ten hours earlier in another

location, did not provide probable cause. *See Byrd*, 185 A.3d at 1024. Additionally, nothing about the vehicle stop — which, again, we find was unlawful — provided probable cause for the police to detain Contes any further.

Fifth, we agree with the suppression court that Contes' did not voluntarily and knowingly provide a *Miranda* waiver and consent to search his home. As previously stated, the police illegally stopped and seized Contes, seized his phone, and instructed him to immediately drive to the Berwick Police station, across county lines, so that Officer Mainiero and the DEA agents could interrogate him. There was no break in custody, as the Commonwealth argues, after the police illegally seized Contes during the vehicle stop, and before he was immediately questioned by multiple members of law enforcement in a locked room at the police station. Here, the suppression court determined that the discovery of the cocaine at Contes' residence was directly linked to the illegal traffic stop:

> [A] vehicle stop of [Contes] by two . . . DEA agents, one . . . FBI agent and at least one . . . State trooper for no reason, the conduct of an illegal search of [Contes'] vehicle and a requirement that [Contes] follow those law enforcement officers to the Berwick Police station in Columbia County *tainted* the voluntariness of [Contes'] statements and consent to search his home.

Opinion Per Pa.R.A.P. 1925, 3/15/24, at 1 (unnecessary capitalization omitted and emphasis added).

On this basis, we further conclude that the search of Contes' home was unlawful. Both the incriminating statements and recovery of contraband were

fruit of the poisonous tree, and we conclude the suppression court properly suppressed it. *See Shabezz*, 166 A.3d at 290. The *Miranda* warning given during Contes' unlawful detention did not purge the taint of the initial unconstitutional act. *See id*.

Finally, while we conclude that the Commonwealth waived this issue, we would agree with the suppression court that the evidence was not admissible under the inevitable discovery doctrine. As stated above, "where law enforcement officers engage in apparent misconduct by negating the warrant requirement, the Commonwealth only can avoid suppression by demonstrating a source 'truly independent from both the tainted evidence and the police or investigative team which engaged in the misconduct.'" *Perel*, 107 A.3d 185 at 195 (citation omitted).

We find that Officer Mainiero's testimony about the months-long investigation of Contes, in combination with his video observation from the morning of the stop, would not have been a sufficient basis to justify a search warrant. *See also* Opinion and Order, 1/16/24, at 3.

In sum, we conclude that the suppression court properly granted Contes' motion to suppress and thus affirm the suppression order.

Order affirmed.

P.J.E. Panella joins the memorandum.

P.J.E. Stevens files a dissenting memorandum.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 2/14/2025