J-S83037-16

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| SCOTT JOHN GRUBBS, | : | |
| | : | |
| Appellant | : | No. 737 WDA 2016 |

Appeal from the Judgment of Sentence April 19, 2016
in the Court of Common Pleas of Westmoreland County,
Criminal Division, at No(s): CP-65-CR-0001175-2013

BEFORE:  FORD ELLIOTT, P.J.E., SHOGAN, AND STRASSBURGER,[*] JJ.

MEMORANDUM BY STRASSBURGER, J.:          **FILED JANUARY 03, 2017**

Scott John Grubbs (Appellant) appeals from the judgment of sentence entered following his convictions for involuntary deviate sexual intercourse (IDSI) – less than 13 years of age, aggravated indecent assault, corruption of minors, and indecent assault.  We affirm.

The trial court summarized the pertinent factual history as follows.

> At the time of the crime, Victim C.N. was five years old. [M.N. and D.N. (Mother and Father)], Victim's parents, and C.N. lived together in Yukon, Westmoreland County.  [Mother and Father's] older daughter, [S.], lived in an in-law apartment downstairs.  [Mother] indicated that C.N. was only permitted in [S.'s] apartment with [S.] or her [M]other's express permission. She stated that at the time of the crime, [Appellant] and [S.] had been dating for approximately one and one-half to two years.  She further testified that [Appellant] was often in [S.'s] apartment, and would occasionally travel upstairs to borrow cigarettes or to eat dinner with the family.  C.N. knew that

_____
[*] Retired Senior Judge assigned to the Superior Court.

[Appellant] was [S.'s] boyfriend, and would be present on occasions when [Appellant] spent time with the family. Prior to that time however, C.N. had not been alone with [Appellant].

On January 17, 2013, [Appellant] was present in the downstairs in-law apartment sleeping while [S.] was at work. At some point, [Appellant] travelled upstairs and [Appellant and Mother] smoked cigarettes together. [Mother] then went upstairs to her bedroom for a short period, and when she returned, [Appellant] asked whether C.N. could go to [S.'s] apartment with him to see Luna, [S.'s] cat. In response, [Mother] told him that she could go downstairs with him, but suggested that [Appellant] keep an eye on C.N. to ensure that she did not "get into" [S.'s] belongings. [Mother] stated that C.N. loved [S.'s] cat, and always wanted to pet and play with her. [Mother] testified that C.N. was in the basement with [Appellant] for approximately twenty minutes. After that time elapsed, she yelled downstairs to ensure that C.N. was not misbehaving. [Appellant] responded that C.N. was fine, and [Mother] requested that C.N. return upstairs soon. Five to ten minutes later, C.N. returned to her bedroom by herself.

[Mother] testified that the next evening, January 18, 2013, as the family, [Appellant,] Nikki Peden and her husband were playing a board game, C.N. "blurted out" that [Appellant] had "touched her bum with his finger" and that he had "touched her va-jay-jay and that he had stuck his jay-jay tongue in her mouth and peed in her mouth." As [Mother] attempted to question [C.N.] regarding the claims, [Mother] testified that [Appellant] began interrupting their conversation, stating that he did not do what C.N. was stating. She testified that to avoid making C.N. and her guests uncomfortable, they sat down to eat dinner. After the guests left and [S. and Appellant] went back downstairs, [Mother] called C.N.'s pediatrician, who directed her to bring C.N. to Children's Hospital in Pittsburgh. C.N. told the doctor at Children's Hospital that "[Appellant] put his finger in her bum and her jay jay and ... put his jay-jay tongue in her mouth and peed in her mouth."

Nikki Peden, a family friend [], testified that she was visiting the [] residence on the evening of January 18, 2013 for dinner and board games. Peden testified that during the course of the evening, C.N. stated to the group that "somebody had put his va-jay-jay tongue in [her] mouth." She also indicated that

there had been a liquid in her mouth. [Mother] asked who had done that. C.N. responded by stating that it was [Appellant], and pointing to him. [Appellant] responded by denying the allegations. Peden testified that she left the residence roughly one half-hour later, as everyone felt uncomfortable about C.N.'s allegations.

Doctor Mary Carrasco, Director of A Child's Place, a unit that assesses potential victims of child abuse, performed a physical examination on C.N. on February 1, 2013. She stated that there were no physical findings of abuse, but testified that even where a child sexual abuse victim reports that penetration has occurred, physical findings are rare. Dr. Carrasco explained that only a very small percentage of children exhibit physical evidence of sexual abuse.

Susan Nathan, a psychologist at A Child's Place, also met with C.N. on February 1, 2013. Nathan recorded her conversation with C.N., and C.N.'s allegations were consistent with reports given to C.N.'s mother and Dr. Carrasco. The audio recording was played at trial.

C.N. testified at trial that as she was sitting on [S.'s] bed looking for Luna the cat, [Appellant] "just grabbed my butt." She also testified [Appellant] touched her private parts with his hands, and put his whole hand underneath her underwear. She stated that [Appellant] rubbed her "butt" that she used to "wipe with toilet paper." She also stated that [Appellant] "put his penis in my mouth," and that he "peed in my mouth ... down my throat," and afterwards "she puked it back out." She stated that after she went back upstairs, she hid under a blanket on her bed.

Trooper Thomas Hartley testified that he was notified of the situation at [C.N's] residence on January 19, 2013. On that date, Trooper Hartley traveled to their Yukon home to ensure that [Appellant] was not present. Thereafter, he spoke with [Mother] to gather information regarding the case. Trooper Hartley filed charges in the case on March 5, 2013. Trooper Hartley served a warrant on [Appellant] on the same date.

After serving the arrest warrant on [Appellant], Trooper Hartley and Trooper Timms transported him to Magistrate District Judge Moore's office for arraignment. Trooper Hartley

testified that while transporting [Appellant], he seemed coherent, and the conversation flowed back and forth regarding unrelated topics. After the group arrived at Magistrate Moore's office, Trooper Hartley read [Appellant] his **Miranda**[1] [r]ights, and [Appellant] signed a **Miranda** waiver and agreed to speak with the troopers.

[Appellant] initially declared that he was innocent of the charges against him. After approximately 20 minutes, Trooper Hartley informed [Appellant] that he believed [Appellant] was lying to him. He stated at that point, he raised his voice at [Appellant], but did not scream. He stated: "I was not in his face, but I did elevate my voice to let him know that I was upset and I was done talking to him because I didn't believe him." At that point, Trooper Hartley left the room to determine whether Magistrate Moore was ready to arraign [Appellant].

After approximately five minutes, Trooper Hartley returned to the room. At that point, Trooper Timms informed him that [Appellant] had confessed to the crimes. He further testified that [Appellant] was agitated, but not irate. Trooper Hartley then explained to [Appellant] that he would like to begin an audio recording of his confession. [Appellant] agreed to the recording. Trooper Hartley testified that at the time of the interview, he did not promise [Appellant] anything in exchange for a confession. He testified that he did not threaten [Appellant] to elicit a confession. Trooper Hartley stated that at the time of the interview, all three individuals remained seated, and none of the officers loomed over [Appellant].

Trial Court Opinion, 6/29/2016, at 1-6.

Prior to trial, Appellant filed a motion seeking to suppress statements he made after he was taken to the magistrate and read his **Miranda** rights. Appellant averred that when he made the statements he was suffering from a mental health issue, rendering his confession unknowing and involuntary.

---

[1] **Miranda v. Arizona**, 384 U.S. 436 (1966).

N.T., 12/12/2014, at 3. Following a hearing, the suppression court denied the motion.

After a jury trial, Appellant was found guilty of the aforementioned crimes. On April 19, 2016, Appellant was sentenced to an aggregate term of 10 to 20 years' incarceration. This timely-filed appeal followed.[2]

Appellant raises two issues for our review.

I. Did the Commonwealth introduce sufficient evidence of "penetration, however slight" to sustain the convictions of involuntary deviate sexual intercourse and aggravated indecent assault?

II. Did the suppression court abuse [its] discretion in denying [Appellant's] motion to suppress his confession?

Appellant's Brief at 6 (answers and unnecessary capitalization omitted).

In his first question, Appellant challenges the sufficiency of the evidence to sustain his IDSI and aggravated indecent assault convictions. Appellant's Brief at 9-12.

However, before we address Appellant's issues on the merits, we must determine whether they have been preserved for our review. It is well-settled that issues not included in a 1925(b) statement are waived. **See** Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal."). **See also Commonwealth v. Poncala**, 915 A.2d 97, 100 (Pa. Super. 2006) ("[A]s a general rule, the

---

[2] Both Appellant and the trial court complied with Pa.R.A.P. 1925.

failure to raise an issue in an ordered Rule 1925(b) statement results in the waiver of that issue on appeal.").

In his 1925(b) statement, Appellant raises only a sufficiency claim as to his IDSI conviction. Appellant's Concise Statement, 6/27/2016. On appeal, Appellant challenges the sufficiency of the evidence to support his convictions for both IDSI and aggravated indecent assault. We find Appellant's challenge concerning his aggravated indecent assault conviction waived for failure to preserve it properly in his 1925(b) statement.

In reviewing Appellant's remaining sufficiency-of-the-evidence claim, this Court must view all evidence admitted in a light most favorable to verdict winner. ***Commonwealth v. Gonzalez***, 109 A.3d 711, 716 (Pa. Super. 2015). In his brief, Appellant states he "must concede that, if believed, [C.N's] testimony as to oral sex [] perpetrated upon [C.N.] by [Appellant] establishes IDSI[.]" Appellant's Brief at 12.[3] Thus, viewing C.N's testimony in a light most favorable to the Commonwealth as the verdict winner, the evidence presented by the Commonwealth is sufficient to support Appellant's conviction for IDSI. Accordingly, no relief is due.

Appellant's final issue challenges the trial court's denial of his motion to suppress his confession. Appellant's Brief at 12-15.

> Our standard of review in addressing a challenge to the denial of
> a suppression motion is limited to determining whether the

---

[3] Appellant goes on to argue that this conduct does not provide sufficient evidence for his aggravated indecent assault conviction. However, as we concluded, *supra*, that issue is waived.

suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, we are bound by these findings and may reverse only if the court's legal conclusions are erroneous. Where ... the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the court[] below are subject to our plenary review.

*Commonwealth v. Perel*, 107 A.3d 185, 188 (Pa. Super. 2014) (quoting

*Commonwealth v. Jones*, 988 A.2d 649, 654 (Pa. 2010)). "Moreover,

appellate courts are limited to reviewing only the evidence presented at the

suppression hearing when examining a ruling on a pre-trial motion to

suppress." *Commonwealth v. Stilo*, 138 A.3d 33, 35–36 (Pa. Super.

2016).

The following principles guide our review if this matter.

Although there is no single litmus-paper test for determining the voluntariness of a confession, it must be established that the decision to speak was a product of a free and unconstrained choice of its maker.... All attending circumstances surrounding the confession must be considered in this determination. These include: the duration and methods of the interrogation; the length of delay between arrest and arraignment; the conditions of detainment; the attitudes of police toward defendant; the defendant's physical and psychological state; and all other conditions present which may serve to drain one's power of [resistance] to suggestion or to undermine one's self-determination.

- 7 -

***Commonwealth v. Hughes***, 555 A.2d 1264, 1273 (Pa. 1989) *quoting*

***Commonwealth v. Kichline****,* 361 A.2d 282 (Pa. 1976).

Appellant argues his confession was not knowing or voluntary, and was the product of coercion. Appellant's Brief at 8, 14-15. Specifically, Appellant avers that the state troopers employed a "good cop, bad cop" technique to elicit his confession. ***Id.*** at 15. Appellant argues his testimony at trial confirms "he was scared and emotional" when Trooper Hartley was "yelling at him and slamming his fist on the table." ***Id.*** at 14-15. Appellant contends he has a mental health history and that his confession was "the product of police tactics to elicit a confession from a citizen who did not make a knowing and voluntary waiver of his ***Miranda*** rights." ***Id.*** at 8.

In its 1925(b) opinion, the trial court offered the following analysis:

> Trooper Hartley testified during a suppression hearing that on March 4, 2013, after [Appellant] and the trooper arrived at Magistrate Moore's office, [Appellant] signed a waiver of ***Miranda*** [r]ights. He testified that [Appellant] stated that he understood everything in the waiver, that he understood what was happening, and he did not have any questions for the trooper. He stated that as they were discussing the allegations, [Appellant] was responding logically, and answered questions and acknowledged that he understood the facts that were being explained to him. After confessing to the charges, [Appellant] agreed to an audio recording of the confession. Trooper Hartley testified that he did not threaten [Appellant] or promise him anything in exchange for his confession. Although he initially denied that he was guilty of the charges against him, he stated to trooper that he was hesitant to confess because he was worried about his girlfriend's reaction.
>
> Trooper Timms testified that there was no indication that [Appellant] was confused, or that he did not understand what was being said. Prior to signing the ***Miranda*** waiver form, he

stated that he understood what was going on and what was read to him. Trooper Timms testified that while Trooper Hartley stepped out of the room, he did not threaten him or promise him anything in exchange for his confession. Trooper Timms further testified that "through my total time with [Appellant] I was in full belief that he understood everything that was going on. He knew why we were there at his house, he knew why he was being transferred to Magistrate Moore's and he knew what the conversation was inside Mr. Moore's smaller office." Trooper Timms stated that in total, [Appellant] was being interviewed by the troopers in Magistrate Moore's office for approximately one hour.

Under a totality of the circumstances, [Appellant's] *Miranda* waiver and subsequent confession was knowing and voluntary and the [suppression court] did not abuse its discretion. The troopers had no reason to believe, and no evidence was introduced at the suppression hearing, to suggest that [Appellant] was not in full control of his faculties, or could not comprehend what was occurring. Although [Appellant] alleges that [Appellant's] confession was "coercive," nothing in the record exists to support that notion. Although Trooper Hartley admitted during the suppression hearing that he did raise his voice, he stressed that he did not scream, nor did either of the troopers "loom over" or threaten [Appellant. Appellant] was only being questioned by the troopers for approximately one hour, and there is nothing in the record to suggest any type of misconduct by the troopers.

In terms of [Appellant's] mental state at the time of the confession, [Appellant] was evaluated at Torrance State Hospital on April 16, 2013, and a report was filed on June 11, 2013. At that time, the report stated that "from the standpoint of competency, the patient has both a rational and factual understanding of his charges. He is aware of the role of the prosecution, defense, judge, and jury within the legal system. He is aware of the nature and logic of a plea bargain. He is capable of working with his attorney in preparing a defense and controlling his behavior in a courtroom setting." Although the doctor could not make any conclusions regarding [Appellant's] state of mind at the time of his confession, the doctor did not suggest that [Appellant] be prescribed any prescription drugs to treat any psychological conditions.

Again, no evidence was introduced at the suppression hearing that [Appellant] was at all suffering from any type of mental deficiency. [W]ithout any evidence or testimony signifying any diminished capacity on the part of [Appellant], the [suppression court] had no basis on which to grant his suppression motion. Thus, the [court] was not in error.

Trial Court Opinion, 6/29/2016, at 9-11.

We find the trial court's analysis well-reasoned and in line with our well-settled case law. Based upon our review of the record and the trial court's findings, we conclude that the evidence does not support Appellant's contention that his confession was unknowingly made. Conversely, we find Appellant has failed to prove his confession was the product of coercion.

Thus, after a thorough review of the record and briefs in this case, we are unconvinced that any of Appellant's arguments entitles him to relief.

Judgment of sentence affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/3/2017

- 10 -