J-S28007-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA   :   IN THE SUPERIOR COURT OF
                                                   :                PENNSYLVANIA
                                                   :

v.                                    :

ALIEK QUASIM CARR              :

Appellant            :     No. 646 MDA 2022

Appeal from the Judgment of Sentence Entered April 23, 2021
In the Court of Common Pleas of Lycoming County Criminal Division at
No(s):  CP-41-CR-0002119-2017

BEFORE:  OLSON, J., McLAUGHLIN, J., and KING, J.

MEMORANDUM BY OLSON, J.:          **FILED: NOVEMBER 15, 2022**

      Appellant, Aliek Quasim Carr, appeals from the April 23, 2021 judgment of sentence that imposed an aggregate term of incarceration of 6 to 24 months' (minus 1 day) after the trial court convicted Appellant, in a non-jury trial, of manufacture, delivery, or possession with the intent to manufacture or deliver a controlled substance and criminal use of a communication facility.[1] We affirm.

      The trial court summarized the factual history as follows:

---

[1] 35 P.S. § 780-113(a)(30) and 18 Pa.C.S.A. § 7512(a), respectively. Appellant's sentencing order was dated April 23, 2021, but was not entered on the trial court docket until May 7, 2021.  The trial court imposed a sentence of 6 to 24 months' (minus 1 day) incarceration for Appellant's conviction of manufacture, delivery, or possession with the intent to manufacture or deliver a controlled substance and the same sentence to run concurrently for his conviction of criminal use of a communication facility.  Trial Court Order, 5/7/21.

Officer Clinton Gardner [("Officer Gardner")] of the Williamsport Bureau of Police and Detective Devin Thompson [("Detective Thompson")] of the South Williamsport Police Department testified on behalf of the Commonwealth. The Commonwealth also submitted a copy of the application for [a] search warrant for [Appellant's] black ["flip" cellular telephone]. The evidence established the following. On October 21, 2017, [Officer] Gardner was working alone in full uniform in a marked police vehicle in the area of High Street and Sixth Avenue near [a gas station and convenience store in Williamsport, Pennsylvania. Officer] Gardner knew the area to be a high crime area, where he had conducted multiple narcotics related arrests. When [Officer] Gardner [drove his police vehicle] into the parking lot[,] he noticed a heavier[-]set black male with a noticeable limp, later identified as [Appellant], pumping gas into a vehicle with [an] Illinois [license plate. Appellant] looked over at [Officer] Gardner multiple times, and walked over to a nearby vehicle [(a white van)] and began talking to an individual[ in the white van]. [Officer] Gardner knew that a heavier[-]set black male with a limp matching [Appellant's] description [] recently fled from a narcotics[-]related stop with a fellow officer. [Officer Gardner interpreted Appellant's movement toward the white van as an effort by Appellant to separate himself from the vehicle bearing the Illinois license plate. Officer] Gardner then parked his [police] vehicle, so as to not block [Appellant's vehicle], and walked over to [Appellant. Officer] Gardner asked [Appellant] "what was going on and what he was doing in the area." [Appellant] responded he was in town for court and to see friends. Upon [Officer] Gardner asking [Appellant] what his name was, [Appellant] provided [Officer] Gardner with his Pennsylvania identification [card], which had a Philadelphia[, Pennsylvania] address. [Officer Gardner returned to his police vehicle with Appellant's identification card and, using the police vehicle's on-board computer system, searched for any outstanding warrants issued against Appellant. After Officer Gardner returned Appellant's identification card to him (as discussed in more detail *infra*), Appellant] then walked back to his vehicle and finished pumping gas as [Officer] Gardner spoke with him and continued to ask him questions. [Appellant] confirmed that the vehicle was a rental. During the interaction, [Officer] Gardner did not indicate to [Appellant] that he was not free to leave, he did not brandish his firearm, and he did not restrict [Appellant's] movements in any way. [Officer] Gardner then asked if [Appellant] had anything illegal on his person. [Appellant] began digging through his pockets, which [Officer] Gardner asked him not to do. While

[Appellant] was digging through his pockets, [Officer] Gardner observed a [pocketknife], a second cell[ular tele]phone [(the black "flip" telephone)], and an unknown amount of [United States] currency. [Officer] Gardner [then] asked [Appellant] why he had two cell[ular tele]phones and asked if there was anything illegal in the [vehicle].

[Officer] Gardner then asked if he could search the [vehicle]. At first, [Appellant] gave [Officer] Gardner permission to search the driver['s] side [of the vehicle], but then withdrew consent prior to [Officer] Gardner starting his search. [Officer] Gardner then informed [Appellant] he would be calling a [narcotics] canine to the scene based on his observations. [Officer] Gardner's purpose for calling a canine [officer] was: [Appellant's] presence in [a] high narcotics trafficking area, [Appellant] matching the description of an individual that fled during a narcotics[-]related stop, [Appellant] having a Philadelphia address, which in [Officer] Gardner's experience is common for drug traffickers in [the Williamsport] area, the possession of two cell[ular tele]phones, the bundle of [United States] currency on [Appellant's] person, and [Appellant's] use of a rental vehicle, which in [Officer] Gardner's experience was common among narcotics traffickers because [rental vehicles] cannot be forfeited. [Officer] Gardner [testified that he] believed[,] at that point[, Appellant] was detained and would have to wait for a canine [officer] to arrive. After being informed that a canine would be called, [Appellant] offered consent to search [his vehicle,] and [Officer] Gardner explained that [Appellant] did not have to provide consent and that he was not forcing [Appellant] to [permit a] search [of] the vehicle. [Appellant] still agreed to grant [Officer] Gardner consent[. D]uring the search, [Officer] Gardner found small rubber bands, [which in Officer Gardner's experience were] commonly used in the packaging of heroin[,] in the sunglass visor [of the vehicle]. When asked why he had the bands, [Appellant] stated [the bands were] for his hair, but [Officer Gardner observed that Appellant] had a shaved head at the time.

[After Officer Gardner searched Appellant's vehicle, but before the arrival of the narcotics canine, Officer] Gardner searched [Appellant's] person. The search of [Appellant's person] yielded two cell[ular tele]phones and ninety-five dollars in mostly twenty[-]dollar denominations in two separate bundles. [Officer] Gardner testified that the use of two cell[ular tele]phones, twenty[-]dollar denominations, and separate bundles of [currency] were all factors consistent with narcotics trafficking.

[Detective] Thompson then arrived with his canine [officer] and was informed of the ongoing situation. The [narcotics] canine alerted several times to the rear portion of the middle console [of the vehicle]. [Police] officers then [removed] the rear portion of the console to find a grey[-]colored satchel that contained a worn prescription bottle containing fifty oxycodone pills with [Appellant's] name on [the bottle]. Based on [Officer] Gardner's training and experience and because of the location [where the prescription] bottle was stored, [its] worn condition[,] and the pills having different insignias/stamps, [Officer Gardner concluded] the pills were for illegal sale. [Appellant] was then taken into custody and searched further.

[Officer] Gardner then obtained a search warrant for [Appellant's] black ["flip" cellular tele]phone. The search warrant [described] the items to be searched as "any electronically stored information and records, including all call logs, [short message service ("SMS")] and [multimedia messaging service ("MMS")] messages, [electronic mail messages ("emails")], contacts list, photographs, videos, or any other electronic storage devices contained within the above mentioned [cellular tele]phone. In relation to 10/14/17 to 10/21/17 as described below[.] CG#74 [(Officer Gardner's initials and police badge number)]." The items to be seized were "any and all information relating to violations of the Controlled Substance, Drug, Device and Cosmetic Act[, 35 P.S. §§ 780-101 to 780-144,] and [18] Pa.C.S.A [§ 7512] (criminal use of a communication facility) from 10/14/2017 to 10/21/2017." From the search[, police] officers took twenty[-]six photographs of incoming/outgoing messages.

Trial Court Opinion, 12/31/19, at 1-4 (extraneous capitalization, original brackets, and record citations omitted).

On November 3, 2017, law enforcement personnel filed a criminal complaint against Appellant, charging him with the aforementioned crimes. Appellant waived his right to arraignment on December 19, 2017, and requested that the matter be scheduled for trial. On January 4, 2018, the Commonwealth filed a criminal information against Appellant setting forth the

- 4 -

aforementioned criminal charges. The trial court subsequently placed Appellant's case on the March 2018 trial list. Upon Appellant's request, and without objection from the Commonwealth, Appellant's trial was continued to October 2018, due to Appellant having undergone a medical procedure. Due to Appellant's travel restrictions, which were the result of his medical rehabilitation, Appellant's trial was continued three additional times. On May 31, 2019, the trial court, having been notified by Appellant's counsel that plea negotiations were unsuccessful, and the matter should be set for trial, granted Appellant's continuance and scheduled the matter to proceed to a pre-trial conference on July 9, 2019.

On June 27, 2019, Appellant filed a motion seeking permission to file an *omnibus* pre-trial motion to suppress evidence *nunc pro tunc*.[2] The trial court scheduled argument on Appellant's request for leave to file a suppression motion *nunc pro tunc* for July 9, 2019, as part of the previously scheduled pre-trial conference. The trial court granted Appellant's request, and on July 11, 2019, Appellant filed an *omnibus* pre-trial motion to suppress evidence

_____

[2] Pennsylvania Rule of Criminal Procedure 579 states that an *omnibus* pre-trial motion "shall be filed and served within 30 days after arraignment, unless opportunity therefor did not exist, or the defendant or defense attorney, or the attorney for the Commonwealth, was not aware of the grounds for the motion, or unless the time for filing has been extended by the court for cause shown." Pa.R.Crim.P. 579(A). Appellant was required to seek the trial court's permission to file an *omnibus* motion *nunc pro tunc* in July 2019, because it was more than 30 days after Appellant waived his arraignment on December 29, 2017.

*nunc pro tunc* ("*omnibus* motion").[3]  On October 14, 2019, the trial court entertained substantive argument on Appellant's *omnibus* motion, and thereafter granted the parties' requests to submit briefs on the matter. Appellant submitted a brief in support of his *omnibus* motion on November 7, 2019, and the Commonwealth submitted a brief in opposition to the *omnibus* motion on November 26, 2019.  On December 31, 2019, the trial court denied Appellant's *omnibus* motion.

The trial court conducted a pre-trial conference on July 14, 2020.[4]  On October 2, 2020, Appellant pleaded not guilty to the aforementioned charges and waived his right to a trial-by-jury.  Appellant subsequently filed a motion seeking the return of property seized by law enforcement.  The trial court granted that motion on January 27, 2021, having been notified that the Commonwealth no longer contested the return of the seized property.[5]

On January 27, 2021, the trial court, in a non-jury trial, convicted Appellant of the two aforementioned criminal charges.  On April 23, 2021, Appellant was sentenced to an aggregate term of incarceration of 6 to 24

---

[3] The trial court granted Appellant's motion to file an *omnibus* motion *nunc pro tunc* in an order that was dated July 9, 2019, but was not entered on the trial court docket until July 26, 2019.

[4] Appellant's pre-trial conference was delayed until July 14, 2020, due to the COVID-19 global pandemic.

[5] The seized property included $6,400.00 in United States currency, two prescription bottles, and two cellular telephones.  Appellant's Motion for Return of Property, 10/15/20, at ¶2.

months, less one day, and was ordered to pay all costs of prosecution and perform 100 hours of community service.[6] Trial Court Order, 5/7/21. On April 28, 2021, Appellant filed a post-sentence motion. The trial court denied Appellant's post-sentence motion on July 2, 2021. Appellant filed a notice of appeal on July 26, 2021.

This Court docketed Appellant's notice of appeal at 1063 MDA 2021. In a September 22, 2021 *per curiam* order, this Court directed Appellant to file a Pa.R.A.P. 3517 docketing statement by October 4, 2021, and advised Appellant that if a docketing statement were not filed, his appeal would be dismissed. In an October 29, 2021 *per curiam* order, this Court dismissed Appellant's appeal for failure to file a Rule 3517 docketing statement, and the certified record was returned to the trial court. On January 6, 2022, Appellant filed a motion with this Court to reinstate his appeal on the grounds that notice of this Court's aforementioned *per curiam* orders had not been provided to Appellant's counsel.[7] In a January 18, 2022 *per curiam* order, we denied Appellant's request because this Court no longer had jurisdiction to reinstate

_____

[6] Appellant received credit for time served from November 17, 2017, to December 19, 2017. Trial Court Order, 5/7/21. The trial court also ordered that Appellant remain released on bail pending his appeal, and directed that Appellant not travel outside the Commonwealth of Pennsylvania without court approval. ***Id.***

[7] The service list attached to each of this Court's aforementioned *per curiam* orders reflects that notice of each order was forwarded to Appellant's counsel *via* the PaCFile system.

Appellant's appeal pursuant to 42 Pa.C.S.A. § 5505, which states that courts may only modify dispositional orders within 30 days.

On remand, the Commonwealth filed a motion to revoke Appellant's bail because his "appeal was no longer pending." Commonwealth's Motion to Revoke Bail, 3/25/22, at ¶7. On March 25, 2022, Appellant filed a petition pursuant to the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. §§ 9541-9546. In his PCRA petition, Appellant asked the PCRA court to reinstate his direct appeal rights. PCRA Petition, 3/25/22, at ¶9. On April 25, 2022, the trial court granted the Commonwealth's motion to revoke Appellant's bail and directed Appellant to begin serving his sentence, effective that same day. Trial Court Order, 4/25/22. In that same order, the PCRA court granted Appellant's petition for collateral relief and ordered that Appellant could file a notice of appeal *nunc pro tunc* within 30 days of said order. In so doing, the court stated,

> [O]n March 25, 2022, counsel for [Appellant] filed a [PCRA petition] seeking relief in the form of permission to appeal *nunc pro tunc*. This matter is currently scheduled for a conference/argument on June 6, 2022. However, in order for [Appellant] to be eligible for PCRA relief, he must actually be serving a sentence.
>
> At the time of the hearing on today's date, counsel for the Commonwealth indicated that he had no objection to the [PCRA court] addressing [Appellant's] PCRA petition at this time, and that [the Commonwealth was] agreeable to the requested relief being granted, so that [Appellant] may file his [direct] appeal *nunc pro tunc*. Additionally, the Commonwealth indicated that [it did] not object to [Appellant's] bail being modified to make him [s]upervised [b]ail [e]ligible pending determination of his appeal.

- 8 -

***Id.*** at 1-2. Thereafter, Appellant filed a notice of appeal on April 28, 2022. On May 4, 2022, Appellant was directed to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). Appellant filed his Rule 1925(b) statement on May 9, 2022. On May 13, 2022, the trial court filed its Rule 1925(a) opinion, relying on its July 2, 2021, and December 31, 2019 opinions.

Appellant raises the following issue for our review: "Whether the trial court erred in denying Appellant's [*omnibus*] motion to suppress evidence seized from his person and from a vehicle he was operating?" Appellant's Brief at 5 (extraneous capitalization omitted).[8]

Preliminarily we must discuss the procedural posture of this case as the question of whether the PCRA court had judicial power to permit Appellant to file a direct appeal *nunc pro tunc* implicates our jurisdiction. ***Commonwealth v. Gaines***, 127 A.3d 15, 17 (Pa. Super. 2015) (*en banc*). In the case *sub judice*, Appellant filed a PCRA petition requesting permission to file a direct appeal *nunc pro tunc*. Section 9543 of the PCRA states, *inter alia*, that in order to be eligible for relief, a petitioner must plead and prove by a preponderance of the evidence that he or she is "currently serving a sentence of imprisonment, probation[,] or parole for the crime" for which he or she was convicted. 42 Pa.C.S.A. § 9543(a)(1)(i). This eligibility requirement – that

_____

[8] In a letter filed with this Court on July 27, 2022, the Commonwealth stated that it would not file a brief in this matter.

the petitioner is currently serving a sentence of imprisonment, probation, or parole – "implicates only the petitioner's ability to obtain a remedy through [PCRA] proceedings, not the jurisdiction of the PCRA court to act on a petition." *Commonwealth v. Fields*, 197 A.3d 1217, 1222 (Pa. Super. 2018) (*en banc*). Thus, in the case *sub judice*, if the PCRA court lacked statutory authority to grant Appellant relief in the form of permission to file an appeal *nunc pro tunc*, Appellant's subsequent notice of appeal was void *ab initio,* and we are without jurisdiction to address the underlying merits of this appeal.

Here, prior to filing his PCRA petition, Appellant was released on bail pending the outcome of his direct appeal (1063 MDA 2021), which this Court dismissed on October 29, 2021. Thus, at the time Appellant filed his PCRA petition, Appellant was not yet serving his term of incarceration but was still subject to a form of punishment and supervision by the judicial system as his sentence had not yet been completed. *See Commonwealth v. Orman*, 408 A.2d 518, 520 (Pa. Super. 1979) (stating that, a petitioner, who is released on bail, is still "in custody" for purposes of filing a *writ* of *habeas corpus*); *see also Commonwealth v. Fisher*, 703 A.2d 714, 717 (Pa. Super. 1997) (stating that, "the PCRA's requirement of 'currently serving' is consistent with the federal *habeas corpus* provision[] requiring that a petitioner be 'in custody' in order to obtain [] relief"); *compare with Commonwealth v. Hart*, 911 A.2d 939, 942 (Pa. Super. 2006) (stating, "[a]s soon as his sentence is **completed**, the petitioner becomes ineligible for relief, regardless of whether

- 10 -

he was serving his sentence when he filed the petition" (emphasis added)). Therefore, within the procedural posture of the case *sub judice*, Appellant satisfied the Section 9543(a)(1)(i) eligibility requirement - petitioner is currently serving a sentence of imprisonment, probation, or parole - for purposes of seeking collateral relief under the PCRA. Consequently, the PCRA court had the judicial power to reinstate Appellant's direct appeal rights. Thus, we have jurisdiction to reach the merits of this appeal.

Appellant's issue challenges the trial court's denial of his *omnibus* motion, which sought to suppress physical evidence uncovered during a search of Appellant's person and vehicle. Appellant's Brief at 11-20.

An appellate court's standard and scope of review of a challenge to the denial of a suppression motion is well-settled.

> An appellate court's standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. [When] the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, the appellate court is bound by those findings and may reverse only if the [suppression] court's legal conclusions are erroneous. Where the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on the appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the [suppression] court are subject to plenary review.

- 11 -

> ***Commonwealth v. Hoppert***, 39 A.3d 358, 361-[3]62
> (Pa. Super. 2012)[, *appeal denied*, 57 A.3d 68 (Pa. 2012)].
>
> Moreover, "appellate courts are limited to reviewing only the evidence presented at the suppression hearing when examining a ruling on a pre-trial motion to suppress." ***Commonwealth v. Stilo***, 138 A.3d 33, 35-36 (Pa. Super. 2016)[.]

***Commonwealth v. Wright***, 224 A.3d 1104, 1108 (Pa. Super. 2019) (original brackets and ellipsis omitted), *appeal denied*, 237 A.3d 393 (Pa. 2020).

**Police Interaction**

At the foundation of his challenge, Appellant contends he was subjected to an investigative detention when "he was interrogated by Officer Gardner" and that this investigative detention was not supported by reasonable suspicion. Appellant's Brief at 12.

The Fourth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, and Article I, Section 8 of the Pennsylvania Constitution protects individuals from unlawful searches and seizures.[9] Our Supreme Court has long held that although the

_____

[9] The Fourth Amendment provides,

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. amend. IV. The Pennsylvania Constitution provides,

Pennsylvania Constitution provides broader protection from unreasonable searches and seizures than the United States Constitution, the ***Terry*** doctrine, announced in the seminal case of ***Terry v. Ohio***, 392 U.S. 1 (1968), "sets forth the reasonableness standard for Article I, [Section] 8 of the Pennsylvania Constitution." ***Commonwealth v. Hicks***, 208 A.3d 916, 925 and 940 (Pa. 2019) (stating, "the ***Terry*** doctrine unequivocally requires something suggestive of criminal activity before an investigative detention may occur" (emphasis omitted)).

The ***Hicks*** Court explained the distinction between a mere encounter and an investigative detention as follows:

> [W]arrantless interactions between citizens and police officers fall into three categories, distinguished one from another by consideration of whether the citizen has been "seized" within the meaning of the Fourth Amendment, the intrusiveness and extent of the seizure, and the justification therefor. The first type of interaction - a mere encounter - does not constitute a seizure. It generally involves a request for information and requires no particular suspicion of criminality because it carries no official compulsion to stop or to respond. During a mere encounter, as long as the person to whom questions are put remains free to disregard the questions and walk away, there has been no intrusion upon that person's liberty or privacy as would under the

---

The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant.

PA CONST. art. I, § 8.

Constitution require some particularized and objective justification.

We recognize only two types of lawful, warrantless seizures of the person, both of which require an appropriate showing of antecedent justification: first, an arrest based upon probable cause; second, a[n investigative detention] based upon reasonable suspicion. Here, we are concerned with this latter type of seizure - interchangeably labeled an "investigative detention," a "Terry stop," or, when coupled with a brief pat-down search for weapons on the suspect's person, a "stop and frisk."

To maintain constitutional validity, an investigative detention must be supported by a reasonable and articulable suspicion that the person seized is engaged in criminal activity and may continue only so long as is necessary to confirm or dispel such suspicion. The asserted grounds for an investigative detention must be evaluated under the totality of the circumstances. So long as the initial detention is lawful, nothing precludes a police officer from acting upon the fortuitous discovery of evidence suggesting a different crime than that initially suspected[.] However, an unjustified seizure immediately violates the Fourth Amendment rights of the suspect, taints the evidence recovered thereby, and subjects that evidence to the exclusionary rule.

*Hicks*, 208 A.3d at 927-928 (citations, original quotation marks, and original brackets omitted). The reasonable suspicion standard allows "a police officer to stop an individual based upon [']specific and articulable facts['] and [']rational inferences from those facts['] that warrant a belief that the individual is involved in criminal activity." *Id.* at 932 (citation and original quotation marks omitted).

For purposes of the Fourth Amendment, a person is "seized" when, "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 [] (1980). When a police officer "accosts an individual and restrains his freedom to walk away, he has 'seized' that person." *Brown*[ *v. Texas*], 443 U.S. [47,] 50 [(1979),] *quoting* *Terry*, 392 U.S. at 16[.] In assessing the impression that would be given to a

- 14 -

reasonable person, a court must determine "whether, taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" *Florida v. Bostick*, 501 U.S. 429, 437 [] (1991)[,] *quoting* *Michigan v. Chesternut*, 486 U.S. 567, 569 [] (1988)[.]

*Hicks*, 208 A.3d at 926-927.

The question of whether a seizure occurred presents a pure question of law and, thus, is subject to plenary review. *Commonwealth v. Lyles*, 97 A.3d 298, 302 (Pa. 2014). "In evaluating the level of interaction, courts conduct an objective examination of the totality of the surrounding circumstances." *Id.* "The pivotal inquiry is whether, in light of the facts and circumstances[,] a reasonable [citizen], innocent of any crime, would have thought he[, or she,] was being restrained had he[, or she,] been in the defendant's shoes." *Commonwealth v. Hampton*, 204 A.3d 452, 458 (Pa. Super. 2019). Factors considered in the totality-of-the-circumstances analysis include: (1) demeanor of the police officer and tone of voice; (2) manner of expression used by the police officer in addressing the citizen; (3) whether the police officer informs the citizen that he or she is suspected of criminal activity; (4) the location and time of the interaction; (5) the visible presence of weapons on the police officer's person; and (6) the content of the questions asked or statements made by the police officer. *Commonwealth v. Parker*, 161 A.3d 557, 363 (Pa. Super. 2017)

"[A] seizure does not occur where [police] officers merely approach a person in public and question the individual or request to see identification."

- 15 -

*Lyles*, 97 A.3d at 303; *see also Commonwealth v. Cost*, 224 A.3d 641, 650 (Pa. 2020) (stating, a police "officer's mere request for identification does not, by itself, transform what would otherwise be a mere encounter into an investigatory detention"). Police officers "may request identification or question an individual so long as the [police] officers do not convey a message that compliance with their requests is required[ and the] individual still maintains the right to ignore the police [officers] and go about his[, or her,] business." *Lyles*, 97 A.3d at 303 (citations and original quotation marks omitted). Within the totality of the circumstances assessment, "the retention by [a] police [officer] of an identification card to conduct a warrant check will generally be a material and substantial escalating factor" that in certain instances may transform a mere encounter into an investigative detention. *Cost*, 224 A.3d at 651; *see also Commonwealth v. Anderson*, 276 A.3d 282, 299 (Pa. Super. 2022) (*en banc*).

Here, Appellant asserts that he was "subjected to an investigative detention when he was interrogated by Officer Gardner concerning who he was, where he was from[,] and what he was doing in Williamsport." Appellant's Brief at 12. The trial court found,

> [Appellant] was subjected to an investigatory detention when [Officer] Gardner informed him a [narcotics] canine would be brought to the scene. At that moment, a reasonable person would not believe he was free to leave, which in fact [Officer] Gardner testified [Appellant] was not permitted to leave at that point.

- 16 -

Trial Court Opinion, 12/31/19, at 6 (record citation omitted).[10]

The record demonstrates that on October 21, 2017, while in police uniform and driving a marked patrol vehicle, Officer Gardner observed Appellant, who he described as a black male having a slight limp when he walked, as Officer Gardner drove his police vehicle into the parking lot of a gas station and convenience store. N.T., 10/14/19, at 4-5. Officer Gardner described the parking lot as located in "a high-narcotics trafficking area" based upon his experience and the number of narcotics-related arrests he conducted in that area. *Id.* at 4. Officer Gardner's observation of Appellant matched the description of a "black male, heavier set[,] with a limp" who fled a narcotics-related traffic stop, according to information a fellow police officer communicated to Officer Gardner prior to October 21, 2017. *Id.* at 5-6. Officer Gardner testified that when he first observed Appellant, he was pumping gas into his vehicle at a filling station in the parking lot of the gas station. *Id.* at 5. After looking at Officer Gardner multiple times, Appellant walked to another vehicle that was parked near-by in the same parking lot and appeared to be talking with someone in the near-by vehicle. *Id.* Without activating his police vehicle lights or sirens, Officer Gardner parked his vehicle in such a way as to not block the movement of Appellant's vehicle. *Id.* at 6.

_____

[10] The Commonwealth conceded that Appellant was subjected to an investigative detention when Officer Gardner informed Appellant that he was calling a narcotics canine to the scene. *See* Commonwealth's Brief in Opposition to Appellant's Motion to Suppress, 11/26/19, at unnumbered page 8.

Upon exiting his police vehicle, Officer Gardner, in full uniform and armed, approached Appellant. *Id.* at 6, 18. Officer Gardner, upon approach, asked Appellant his purpose for being in Williamsport, to which Appellant indicated that he was in Williamsport to visit friends and "for court." *Id.* Officer Gardner "explained to [Appellant] that [a fellow police officer] had a male run from him recently" and then asked Appellant his name. *Id.* at 6. Appellant provided Officer Gardner with a Pennsylvania identification card. *Id.* at 6, 18. Upon receiving Appellant's identification card, Officer Gardner noted that Appellant had a Philadelphia, Pennsylvania address. *Id.* at 6. Officer Gardner returned to his police vehicle with Appellant's identification card and, using the vehicle's on-board computer system, searched for outstanding warrants issued against Appellant. *Id.* at 19. Officer Gardner then walked back to Appellant and returned his identification card to him.[11] *Id.*

At this point, Appellant walked back to his vehicle, located near a gas pump, and Officer Gardner followed him. *Id.* at 7, 19. Noticing that Appellant's vehicle had an out-of-state license plate, Officer Gardner asked Appellant if the vehicle was rented, and Appellant confirmed that the vehicle was, in fact, a rental vehicle. *Id.* at 7. Officer Gardner then asked Appellant

_____

[11] Although Officer Gardner testified that he "assumed" he returned Appellant's identification card to him, he did not recall specifically doing so. Because we view the evidence in the light most favorable to the Commonwealth, as the prevailing party, it may be inferred that Officer Gardner returned Appellant's identification card to him. N.T., 10/14/19, at 19.

if "he had anything illegal on his person" because he noticed that Appellant had "a [pocketknife] clipped to his front right pant[s] pocket." *Id.* Appellant "began digging through his pockets" and continued to do so despite Officer Gardner's request that he stop. *Id.* Officer Gardner testified that, as Appellant was "digging through his pockets," he observed a second cellular telephone (a black "flip" cellular telephone), in Appellant's possession, in addition to a different cellular telephone seen in Appellant's possession earlier. *Id.* at 7, 20-21. When asked why he had a second cellular telephone, Appellant did not provide an answer. *Id.* at 7-8. It was at this point that Officer Gardner asked Appellant if he had anything illegal in his vehicle and whether Appellant would consent to a search of the vehicle. *Id.* at 8. Officer Gardner testified that Appellant initially provided consent to search the driver's side of the vehicle but then withdrew his consent. *Id.* at 8-9, 21. Officer Gardner, thereupon, informed Appellant that he would be requesting a canine officer to the scene that was trained to detect, *inter alia*, the presence of narcotics. *Id.* at 8, 21. Officer Gardner considered Appellant "detained" at this point. *Id.* at 21 (stating, "[a]t that point he was, in my mind, detained"). Officer Gardner testified that Appellant then stated there was nothing illegal in the vehicle and consented to a search of the vehicle. *Id.* at 8, 21-22.

Officer Gardner, upon conducting a human search of Appellant's vehicle, found "heroin packing bands and a clear plastic bag" in the sunglass compartment located above the front windshield of the vehicle. *Id.* at 11, 22. When asked why he possessed these small, black rubber bands, Appellant

informed him they were for use in his hair, which Officer Gardner noted Appellant did not have any hair. *Id.* at 11-12. Officer Gardner then conducted a search of Appellant's person, recovering two cellular telephones and two bundles of United States currency.[12] *Id.* at 12, 22.

Thereafter, the narcotics canine arrived with his handler, Detective Thompson. *Id.* at 12, 25. Officer Gardner informed Detective Thompson that Appellant initially consented to a search of his vehicle, withdrew that consent, and upon learning that a narcotics canine was requested to the scene, consented to a search of the vehicle. *Id.* at 26-27; *see also id.* at 12-13 (setting forth similar testimony by Officer Gardner). The narcotics canine alerted the police officers to the possible presence of narcotics in the "rear portion of the center console[.]"[13] *Id.* at 13. Upon further search, the police officers found a "gray-colored satchel" containing a prescription bottle, having

_____

[12] Officer Gardner retrieved a total of $95.00 in United States currency, the majority of which was in $20.00 denominations. The two bundles were comprised of $60.00 and $35.00, respectively. N.T., 10/14/19, at 12.

[13] Detective Thompson described the canine search of the vehicle as follows,

"I typically do [a search] twice. [The canine officer] was first deployed on an on-lead search of the [vehicle. The canine officer] quickly alerted to the rear area of the center console towards the back seats. I brought [the canine officer] back out of the car, unhooked him from the lead, let him do a second interior search not connected to me as the handler and he, again, quickly alerted to the same location.

N.T., 10/14/19, at 27.

a well-worn label indicating the bottle belonged to Appellant, with 50 oxycodone tablets in the bottle. *Id.* at 13, 23. Thereupon, Appellant was taken into custody and transported to the police station for further questioning. *Id.* at 14. A search warrant was subsequently obtained for the search of Appellant's black "flip" cellular telephone. *Id.* at 14-15.

Upon review, we concur with the trial court, and the record supports, that Officer Gardner had reasonable suspicion to subject Appellant to an investigatory detention. We conclude as a matter of law, however, that based upon the individual circumstances of the case *sub judice*, the investigative detention of Appellant began when Officer Gardner obtained Appellant's identification card and returned to his police vehicle with the identification card to conduct an inquiry **after** informing Appellant that a fellow police officer "had a male run from him recently[.]"

The record demonstrates that Officer Gardner, armed with the knowledge that a male matching Appellant's description recently fled a narcotics-related traffic stop, approached Appellant and inquired about his presence in Williamsport. Officer Gardner was in full police uniform, which included a visible firearm. Upon hearing Appellant's explanation, Officer Gardner informed Appellant that a fellow police officer "had a male run from him recently[,]" objectively implying that the male was a person-of-interest to the fellow police officer. Officer Gardner then asked Appellant his name, to which Appellant responded by providing Officer Gardner an identification card. Noting that Appellant lived in Philadelphia, Officer Gardner took the

- 21 -

identification card and returned to his police vehicle to conduct an inquiry using the police vehicle's on-board computer system. There is no evidence, however, that, prior to returning to his police vehicle with the identification card, Officer Gardner explained to Appellant why he retained Appellant's identification card and what he intended to do with it upon his return to the police vehicle.

An objective assessment of the totality of the circumstances in the case *sub judice* demonstrates that Appellant was not free to terminate his encounter with Officer Gardner once the police officer retained Appellant's identification card and returned to the police vehicle to conduct a warrant search and further inquiries. It was at this moment that Appellant's mere encounter with Officer Gardner was transformed into an investigative detention. *See Lyles*, 97 A.3d at 304 (stating, a mere "encounter involving a request for identification could rise to a detention when coupled with circumstances of restraint of liberty, physical force, show of authority, or some level of coercion beyond the [police] officer's mere employment, conveying a demand for compliance or that there will be tangible consequences from a refusal"); *see also Cost*, 224 A.3d at 651 (noting that, "[o]nce the identification is handed over to police and they have had a reasonable opportunity to review it, if the identification is not returned to the detainee it is difficult to imagine that any reasonable person would feel free to leave without it" (original brackets omitted)); *Anderson*, 276 A.3d at 300 (finding that, a police officer's request for identification coupled with investigatory

questions, *i.e.*, whether the person was on parole or had anything illegal on his person, "clearly demonstrated a 'substantial escalating factor' within the totality assessment that [the person] was, indeed subjected to an investigative detention"); **Parker**, 161 A.3d at 364 n.9 (recognizing that an investigatory detention occurs when a police officer informs a citizen that he is talking to the citizen because he fits the description of a suspect in a nearby criminal incident and immediately asks for identification).

Although, as a matter of law, Appellant's mere encounter with Officer Gardner, based upon the facts as supported by the record, transformed into an investigative detention earlier in time than originally determined by the trial court (or conceded to by the Commonwealth), we concur that Officer Gardner had reasonable suspicion of criminal activity when he initiated this investigative detention. Officer Gardner articulated that the area in which he encountered Appellant was a "high-narcotics trafficking area" in which he previously conducted a number of narcotics-related arrests. Appellant's appearance, according to Officer Gardner, matched that of a "black male, heavier[-]set with a limp" that recently fled a narcotics-related traffic stop conducted by a fellow police officer. In particular, Officer Gardner observed Appellant walking in the parking lot with a limp. Officer Gardner further stated that, while he was driving his police vehicle into the gas station parking lot, he noticed that Appellant demonstrated suspicious behavior in that he "looked over at [Officer Gardner] multiple times" before walking away from his vehicle in an effort, as it appeared to Officer Gardner, to distance himself from his

- 23 -

vehicle. Finally, upon reviewing Appellant's identification card, Officer Gardner noted that Appellant resided in Philadelphia. Officer Gardner knew from his law enforcement experience that individuals from Philadelphia came to Williamsport "for the sole purpose of narcotics trafficking." In viewing the totality of the circumstances, Officer Gardner's investigative detention of Appellant was based upon specific and articulable facts, and rational inferences from those facts, which warranted a belief that Appellant may have been involved in criminal activity. Therefore, we discern no error in the trial court's conclusion that reasonable suspicion supported the investigative detention of Appellant.

**Consent to Search Vehicle**

Next, Appellant asserts that his consent to search his vehicle was not given voluntarily, knowingly, and intelligently and, therefore, any items seized as a result of this search should have been suppressed.[14] Appellant's Brief at 13-14.

It is well-settled that,

> [a] search conducted without a warrant is deemed to be unreasonable and therefore constitutionally impermissible, unless an established exception applies. One such exception is consent, voluntarily given. The central Fourth Amendment inquiries in consent cases entail assessment of the constitutional validity of

---

[14] To the extent that Appellant asserts that the evidence seized from a search of his vehicle was the product of an illegal investigatory detention unsupported by reasonable suspicion (*see* Appellant's Brief at 13-14), we find this argument moot in light in of our discussion *supra*.

the citizen[-]police encounter giving rise to the consent; and, ultimately, the voluntariness of consent.

**Commonwealth v. Strickler**, 757 A.2d 884, 888 (Pa. 2000) (citations omitted). When "a lawful interaction precede[s] an alleged consent, the court must then determine whether the [Commonwealth] has adequately proven that the consent was made voluntarily and was not the product of duress or coercion." **Commonwealth v. Reid**, 811 A.2d 530, 545 (Pa. 2002), *cert. denied*, 540 U.S. 850 (2003). A "court must review the totality of circumstances surrounding a consent to determine whether it was made voluntarily" and in so doing "should evaluate the characteristics of the accused [(*i.e.*, the accused's age, education, and prior criminal history)], the interaction between the accused and the police, and assess how a reasonable person in the accused's shoes would have reacted to that interaction." **Reid**, 811 A.2d at 546 (footnote omitted).

> [T]he following factors [] are pertinent to a determination of whether consent to search is voluntarily given: 1) the presence or absence of police excesses; 2) whether there was physical contact; 3) whether police directed the citizen's movements; 4) police demeanor and manner of expression; 5) the location of the interdiction; 6) the content of the questions and statements; 7) the existence and character of the initial investigative detention, including its degree of coerciveness; 8) whether the person has been told that he is free to leave; and 9) whether the citizen has been informed that he is not required to consent to the search.

**Commonwealth v. Kemp**, 961 A.2d 1247, 1261 (Pa. Super. 2008), *relying on* **Strickler**, 757 A.2d at 898-899. Ultimately, the "Commonwealth bears the burden of establishing that a consent is the product of an essentially free

- 25 -

and unconstrained choice - not the result of duress or coercion, express or implied, or a will overborne - under the totality of the circumstances." *Strickler*, 757 A.2d at 901.

We concluded *supra* that Officer Gardner possessed reasonable suspicion to support the investigative detention he initiated by securing Appellant's identification card and returning with it to his police vehicle to undertake informational searches. When asked by Officer Gardner, thereafter, Appellant denied the presence of contraband in his vehicle. N.T., 10/14/19, at 8. Officer Gardner then asked Appellant if he would consent to a search of the vehicle. *Id.* Appellant initially consented to a search of the driver's side of the vehicle but then withdrew his consent. *Id.* Officer Gardner then informed Appellant that he intended to request a narcotics canine to conduct a search of the vehicle. *Id.* at 8-9. Appellant then provided consent to search the vehicle. *Id.* at 8-10. Officer Gardner explained to Appellant "multiple times he did not have to provide consent, [and that] I was not forcing him to [consent to a] search [of] the vehicle." *Id.* at 8. Specifically, Officer Gardner testified that,

> Once he learned that I was calling a [canine officer,] or that I was requesting a [canine officer,] is when he said you can go ahead and search [the vehicle]. Officer Minnier was also on scene at that point. I reiterated to [Appellant], like I said, multiple times I said, you know, you already said no [to a search of the] driver's side [of the vehicle]. I said you don't have to provide consent, I'm not forcing you to provide consent, it's up to you and he, again, stated that he understood and that I may search [the vehicle].

*Id.* at 10.

- 26 -

Based upon the totality of the circumstances, we concur with the trial court that Appellant's "consent was part of a lawful police interaction and was voluntarily given to [Officer] Gardner despite [Officer] Gardner informing him multiple times that he did not have to consent." **_See_** Trial Court Opinion, 12/31/19, at 10. Importantly, it may be inferred that, because Appellant initially provided limited consent, but subsequently withdrew his consent, he understood (1) he did not need to consent to a search of the vehicle, and (2) he was able to withdraw or limit the scope of the consent to search the vehicle even after providing it. In viewing the evidence presented in the light most favorable to the Commonwealth as the prevailing party at the suppression hearing, Officer Gardner informed Appellant multiple times that he was not compelled to give consent. Moreover, while Appellant agreed to permit a search of the vehicle after Officer Gardner advised that he intended to summon a narcotics canine to the scene, we do not find Officer Gardner's reference to the canine officer to be so coercive that it vitiates the voluntary nature of Appellant's consent. Rather, Appellant's knowledge that a narcotics canine would be brought to the scene provided Appellant with a full understanding of the scope and method of the ensuing search to which he would be subjected. Ultimately, Appellant consented to the canine search without limitation, either in terms of the area of the vehicle to be searched or the method by which the search would be conducted, _i.e._, human search verses canine search. As such, we conclude that Officer Gardner's statements informing Appellant of an impending canine search did not diminish the

voluntary nature of Appellant's consent. *See Commonwealth v. Valdivia*, 195 A.3d 855, 862-870 (Pa. 2018) (holding that, a police officer's failure to inform a defendant that a search was to be conducted by a canine officer, rather than by a human police officer, goes to the scope of the permitted search and does not invalidate the voluntariness of the consent absent additional evidence that the police officer acted stealthily, secretly, or deceitfully). Moreover, because Appellant provided consent for the police officers to conduct a human search of his vehicle, the recovery of the "heroin packing bands," together with the clear plastic bag, from the vehicle's sunglass compartment was constitutionally sound.

Appellant argues, alternatively, that, even if his consent to search the vehicle is deemed voluntary, he did not authorize the use of a narcotics canine to search the interior of the vehicle. Appellant's Brief at 17 (stating, "Appellant never gave consent to a [canine] search at all[, rather his] consent was limited to the driver['s] side of the vehicle").

As our Supreme Court in *Valdivia*, *supra*, explained,

a determination of the scope of consent given for police to conduct a search requires consideration of what a reasonable person in the position of the defendant would have believed he or she was allowing, based on the exchange that occurred between police and the individual. The scope of a search, in turn, is limited by the terms of its authorization. To be justified by consent, the scope of the search actually made should be no broader than the scope of consent given.

*Valdivia*, 195 A.3d at 865 (citations and quotation marks omitted). As the *Valdivia* Court recognized, "a search by a trained narcotics [canine] is itself

- 28 -

a search [that] is distinct from a search conducted by a human [police] officer." *Id.* at 866.

In the instant case, as discussed *supra*, Appellant initially provided consent but limited the search to the driver's side of the vehicle. Appellant then withdrew this consent. Officer Gardner next informed Appellant that a narcotics canine would be requested. Thereafter, Appellant provided consent to search his vehicle without limitation as to the area to be searched or the method by which the search would be conducted. We concur with the trial court, and the record supports, that at the time Appellant provided consent to search his vehicle, a reasonable person in Appellant's position would have been aware that a narcotics canine may be employed in a search of the vehicle. **See** Trial Court Opinion, 12/31/19, at 10-11. Therefore, the canine search of the interior of Appellant's car was within the scope of consent voluntarily provided, and Appellant's challenge is without merit. **See cf. Valdivia**, 195 A.3d at 867 (concluding that, a reasonable person in Valdivia's position would not have understood that the search was to be conducted by a narcotics canine when the canine officer, or its handler, was not present prior to consent and the interaction between Valdivia and the police officer **did not "suggest that a canine was going to be used to conduct the search"** (emphasis added)). Because a canine search of Appellant's vehicle fell within the scope of the consent provided, the discovery of, and seizure of, the prescription bottle, which bore a label indicating Appellant's name and contained a controlled substance, was constitutionally sound.

**Search of Appellant's Person**

Next, Appellant argues that the warrantless search of his person, which he contends occurred incident to his arrest,[15] was illegal because "the arrest was conducted without probable cause to believe that Appellant was guilty of an offense." Appellant's Brief at 14. As such, Appellant asserts that the seizure of two cellular telephones and $95.00 in United States currency was illegal and the trial court erred by not suppressing this evidence. *Id.*

In denying Appellant's request to suppress the evidence seized from his person, the trial court stated,

> The doctrine of inevitable discovery applies here. The testimony is clear that [Officer] Gardner seized [Appellant's cellular telephones] and currency prior to finding the [prescription bottle] in the vehicle. Therefore, based on [this Court's decision in ***Commonwealth v. Van Winkle***, 880 A.2d 1280 (Pa. Super. 2005),] as long as the [prescription] bottle in [Appellant's] vehicle was validly seized pursuant to a proper search, seizure of [Appellant's cellular telephones] and currency should not be suppressed under the doctrine of inevitable discovery. Additionally, factoring into [the trial court's] decision are the facts that [Officer] Gardner was already aware of the [cellular telephones] and currency, due to [Appellant] taking the items out of his pants pocket and displaying them voluntarily and the

---

[15] Appellant's assertion that he was taken into police custody at the time of the search of his person is misplaced. The record demonstrates, as discussed *infra*, that when Officer Gardner searched Appellant's person, Appellant was only detained as part of an on-going investigatory detention. ***See Commonwealth v. Dix***, 207 A.3d 383, 388 (Pa. Super. 2019) (stating that, "[a] custodial detention occurs when the nature, duration and conditions of an investigative detention become so coercive as to be, practically speaking, the functional equivalent of an arrest" (citation and brackets omitted)), *appeal denied*, 217 A.3d 790 (Pa. 2019).

information seized from within the [cellular "flip" telephone] was not taken until after a search warrant was obtained.

Trial Court Opinion, 12/31/19, at 8. For the reasons that follow, we agree with the trial court that the items recovered from the search of Appellant's person were not subject to exclusion under doctrine of inevitable discovery.

> A search conducted without a warrant is deemed to be unreasonable and[,] therefore[,] constitutionally impermissible, unless an established exception applies. Exceptions to the warrant requirement include the consent exception, the plain view exception, the inventory search exception, the exigent circumstances exception, the automobile exception[,] the stop and frisk exception, and the search incident to arrest exception.

*Commonwealth v. Simonson*, 148 A.3d 792, 797 (Pa. Super. 2016) (quotation marks and citations omitted), *appeal denied*, 169 A.3d 33 (Pa. 2017).

We first address the nature of the challenged search of Appellant's person and whether that search falls within one of the recognized exceptions to the warrant requirement. Officer Gardner searched Appellant's person sometime after the investigative detention commenced but before the canine search of Appellant's vehicle occurred. At this time, Officer Gardner considered Appellant "detained" but not subject to custodial arrest. Even though Officer Gardner observed a knife clipped to Appellant's pocket when this citizen-police encounter began, Officer Gardner did not conduct an immediate search for weapons, nor does it appear from the record that Officer Gardner perceived an immediate threat from a weapon concealed on Appellant's person. In view of these circumstances, we conclude that

Appellant was subjected to an evidentiary search and not a brief "pat-down" or "weapons frisk" aimed at protecting a police officer during an investigative detention.

We also exclude application of the remaining exceptions to the warrant requirement. The plain view or plain feel doctrine does not support the search of Appellant's person. Cellular telephones and United States currency have lawful uses, and their connection to criminal activity is not immediately ascertainable through brief visual observation or tactile manipulation. *See Commonwealth v. Luczki*, 212 A.3d 530, 547 (Pa. Super. 2019) (stating that, the "plain view doctrine permits the warrantless seizure of an object when: (1) a[ police] officer views the object from a lawful vantage point; (2) it is immediately apparent [from the surrounding circumstances] that the object is incriminating; and (3) the [police] officer has a lawful right of access to the object" (citation and original quotation marks omitted)). Moreover, the facts surrounding the search of Appellant's person do not implicate the inventory search exception, the exigent circumstances exception, or the automobile exception. Lastly, as the record demonstrates, Officer Gardner searched Appellant before the canine search of Appellant's vehicle yielded the prescription bottle and during a point in the encounter when Officer Gardner considered Appellant "detained," but not subject to custodial arrest. Thus, the search incident to arrest exception does not justify Officer Gardner's conduct. *See Commonwealth v. Wright*, 742 A.2d 661, 665 (Pa. 1999) (stating that, "[a] warrantless search incident to an arrest is valid 'only if it is substantially

contemporaneous with the arrest and confined to the immediate vicinity of the arrest.'"), *quoting **Shipley v. California***, 395 U.S. 881 (1969). Therefore, as the trial court concluded, the Commonwealth, in the case *sub judice*, can only avoid suppression through application of the inevitable discovery doctrine.

The inevitable discovery doctrine, in limited instances, permits the admissibility of evidence that was illegally obtained (*i.e.*, obtained *via* a warrantless search without exception) if the Commonwealth "can establish by a preponderance of the evidence that the illegally obtained evidence ultimately or inevitably **would** have been discovered by lawful means[.[16]]" ***Commonwealth v. King***, 259 A.3d 511, 522 (Pa. Super. 2021) (emphasis added); ***see also Commonwealth v. Perel***, 107 A.3d 185, 194 (Pa. Super. 2014), *appeal denied*, 124 A.3d 309 (Pa. 2015). This Court has cautioned, however, that "the inevitable discovery doctrine is not a substitute for the warrant requirement[, and the Commonwealth] must demonstrate that the evidence **would** have been discovered absent the police misconduct not simply that [law enforcement] somehow **could** have lawfully discovered it." ***Perel***, 107 A.3d at 196 (emphasis in original). The ***Perel*** Court reiterated that when law enforcement officers obtain evidence through apparent misconduct, "the Commonwealth only can avoid suppression by

---

[16] Black's Law Dictionary defines the term "inevitable" as, *inter alia*, that which is "incapable of being avoided." BLACK'S LAW DICTIONARY 698 (5th ed. 1979).

demonstrating a source truly independent from both the tainted evidence and the police or investigative team which engaged in the misconduct." ***Id.*** at 195 (citation and original quotation marks omitted); ***see also Commonwealth v. Foy***, 248 A.3d 485, at *4 (Pa. Super. filed Jan. 15, 2021) (unpublished memorandum) (stating, the inevitable discovery doctrine "does not apply if the [police] officers who would have allegedly inevitably discovered the evidence were the same [police] officers who obtained it through improper actions"). Simply stated, the inevitable discovery doctrine requires a showing of a truly independent, lawful path to discovery of the evidence that was actually undertaken.

In the case *sub judice*, after informing Appellant that he was requesting a narcotics canine to the scene, Officer Gardner considered Appellant to be "detained" at this point.[17] N.T., 10/14/19, at 21 (indicating that Appellant would have to wait there until the narcotics canine arrived and was not free to leave). Appellant then provided voluntary consent to search his vehicle, and upon doing do, Officer Gardner discovered small black rubber bands, which he described as "heroin packaging bands" based upon his narcotics investigation experience. ***Id.*** at 11, 22. When asked about the rubber bands, Appellant informed Officer Gardner that the bands were for use in his hair.

---

[17] Because Officer Gardner only further detained Appellant as part of an on-going investigatory detention and did not arrest Appellant, it may be inferred, and the record supports, that Officer Gardner did not have probable cause to arrest Appellant at this point in time.

*Id.* at 12. Officer Gardner remarked that Appellant did not have hair on which to use the bands and stated that Appellant did not provide an answer to Officer Gardner's observation. *Id.* The Commonwealth presented no further evidence that Officer Gardner discovered additional items during his search of the vehicle that suggested Appellant was engaged in narcotics trafficking. Officer Gardner then conducted a search of Appellant's person, discovering two cellular telephones and $95.00 in United States currency on his person. *Id.* Officer Gardner previously observed these seized items when Appellant, while reaching into his pockets, displayed the second cellular telephone and an unknown amount of currency to Officer Gardner voluntarily. *Id.* at 7. Approximately 10 to 20 minutes after the search of Appellant's person, a canine search of the vehicle occurred and a prescription bottle having a label bearing Appellant's name was discovered. *Id.* at 12-13. The prescription bottle contained 50 oxycodone tablets, having different insignias and stamps on them. *Id.* at 13, 16. Appellant was then taken into police custody. *Id.* at 14 (stating, Appellant "was taken into custody and transported to City Hall to be searched further").

Appellant's cellular telephones and currency were admissible pursuant to the inevitable discovery doctrine. Appellant consented to a search of his vehicle, and we have rejected his challenge to the voluntary nature of his consent. As such, law enforcement possessed valid grounds to search Appellant's vehicle and discover the prescription bottle. This discovery gave

Officer Gardner sufficient probable cause to formally arrest Appellant.[18]   As such, Officer Gardner was permitted to conduct a search of Appellant's person incident to this arrest.   Under these circumstances, as in *Van Winkle*, law enforcement officials would have ultimately and inevitably discovered the cellular telephones and currency on Appellant's person and lawfully seized these items through procedures independent from and untainted by the prior unsupported search of Appellant's person.   *See Van Winkle*, 880 A.2d at 1285 (holding that, the inevitable discovery exception allowed admission of currency discovered on Van Winkle's person where contraband was validly seized during an ensuing, and constitutionally justified, vehicle search and discovery of the contraband would have led to a search of Van Winkel's person incident to his arrest); *see also Perel*, 107 A.3d at 196.   Therefore, the trial court did not err in denying Appellant's request to suppress these items.

### Search Warrant for Cellular Telephone

_____

[18]

> Probable cause is made out when the facts and circumstances which are within the knowledge of the officer at the time of the stop, and of which he has reasonably trustworthy information, are sufficient to warrant a man of reasonable caution in the belief that the suspect has committed or is committing a crime.  The question we ask is not whether the officer's belief was correct or more likely true than false.  Rather, we require only a probability, and not a *prima facie* showing, of criminal activity. In determining whether probable cause exists, we apply a totality of the circumstances test.

*Commonwealth v. Calabrese*, 184 A.3d 164, 166-167 (Pa. Super. 2018), *citing Commonwealth v. Martin*, 101 A.3d 706, 721 (Pa. 2014).

Finally, Appellant contends that the seizure of information obtained from a search of his cellular "flip" telephone pursuant to a warrant was illegal because the search warrant was invalid.[19] Appellant's Brief at 19-20. Appellant asserts that "the items to be searched for and seized [from his cellular telephone] are not identified [in the search warrant] with sufficient specificity." *Id.* at 20. Appellant argues that,

> [t]he problem with the description of the items to be seized in the case at bar is that [the search warrant] allows the searching [police] officer to rummage through Appellant's data on his [cellular telephone] between October 14, 2017[,] and October 21, 2017[,] to determine what conversations or other information relate to violations of the Controlled Substance, Drug, Device and Cosmetic Act or the Pennsylvania Crimes Code[ (specifically, criminal use of a communication facility, 18 Pa.C.S.A. § 7512(a))].

Appellant's Brief at 20.

In denying Appellant's *omnibus* motion on this ground, the trial court explained,

> The search warrant at issue lists the items to be searched as: "Any electronically stored information and records, including all call logs, [SMS] and [MMS] messages, emails, contacts list, photographs, videos, or any other electronic storage devices contained within the [black "flip" cellular tele]phone. In relation to 10/14/17 to 10/21/17 as described below[.] CG#74." Commonwealth's Exhibit [] 1[,] 10/26/17, at 4. The portion [handwritten] stating "[i]n relation to 10/14/[17] to 10/21/17 as

---

[19] To the extent that Appellant argues that the evidence seized from Appellant's cellular telephone was illegal because the search of his cellular telephone was the product of: (1) an illegal investigative detention; (2) an illegal search of his vehicle; and (3) the illegal seizure of the prescription bottle, we find this argument moot for the reasons discussed *supra*. **See** Appellant's Brief at 19.

described below[.] CG#74" refers to the items to be seized, which states "[a]ny and all information relating to violations of the Controlled Substance, Drug Device and Cosmetic Act and [the Pennsylvania Crimes Code] (criminal use of a communication facility[, 18 Pa.C.S.A. § 7512]) from 10/14/2017 to 10/21/2017." The accompanying affidavit is clear that based on [Officer] Gardner's observations and evidence seized[,] the search warrant is for believed narcotics trafficking. The items to be searched and seized are [specifically limited] to only information related to the "violation of the Controlled Substances, Drug, Device and Cosmetic Act and [the Pennsylvania Crimes Code] (criminal use of a communication facility[, 18 Pa.C.S.A. § 7512])." This specificity is sufficient and narrowly tailored. Additionally, the search warrant is contained within a distinct set of dates to keep [police] officers from conducting a fishing expedition. Therefore [the trial court] finds the search warrant was appropriately specific in what information could be looked at, what information was being looked for, and what information could be subsequently seized.

Trial Court Opinion, 12/31/19, at 14-15 (caselaw citations and extraneous capitalization omitted).

Recently, our Supreme Court reiterated that,

[the Pennsylvania] Constitution requires that all warrants, including warrants to search a digital space, [such as a cellular telephone,] (1) describe the place to be searched and the items to be seized with specificity and (2) be supported by probable cause to believe that the items sought will provide evidence of a crime.

*Commonwealth v. Green*, 265 A.3d 541, 553 (Pa. 2021).[20] As the *Green*

Court held, a warrant for the search of a cellular telephone must describe

_____

[20] Appellant challenges only the first requirement for a valid warrant to search a cellular telephone. *See* Appellant's Brief at 19-20. Therefore, we limit our review to whether the trial court erred in finding that the search warrant described the place to be searched and the items to be seized with specificity. *Green*, 265 A.3d at 553.

nearly as may be, *i.e.*, as specifically and as reasonably possible, those items to be searched. **Id.**; **see also** PA. CONST. art. I, § 8 (stating, "no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant"). It is well-established that,

> in any assessment of the validity of the description contained in a warrant, a court must initially determine for what items probable cause existed. The sufficiency of the description must then be measured against those items for which there was probable cause. Any unreasonable discrepancy between the items for which there was probable cause and the description in the warrant requires suppression. An unreasonable discrepancy reveals that the description was not as specific as was reasonably possible.

**Commonwealth v. Grossman**, 555 A.2d 896, 900 (Pa. 1989).

In the case *sub judice*, Appellant does not challenge the search of his cellular telephone on the grounds that Officer Gardner lacked probable cause to believe Appellant utilized his cellular telephone for the purpose of trafficking narcotics.[21] Rather, Appellant asserts that the warrant did not specifically detail what information could be obtained from a search of his cellular telephone based on the suspicion that Appellant was using this cellular telephone for purpose of trafficking narcotics. The search warrant specifically

---

[21] In addition to the numerous factors supporting a belief that Appellant was trafficking narcotics, as discussed *supra*, Officer Gardner testified that, based upon his experience and training in narcotics interdiction, a narcotics trafficker commonly possessed two cellular telephones, one for personal use and one for use in trafficking narcotics. N.T., 10/14/19, at 9. Appellant was found to be in possession of two cellular telephones at the time of his arrest.

identified that the search was being requested for a black "flip" cellular telephone found on Appellant's person on October 21, 2017. The search warrant described that the search was for all call logs, SMS and MMS messages, emails, contract lists, photographs, videos, and any other information stored on the cellular telephone that may be related to a violation of the Controlled Substance, Drug, Device, and Cosmetic Act or 18 Pa.C.S.A. § 7512. The search was specifically limited to obtaining the aforementioned evidence for the eight days prior to and including the date of the incident, namely October 14, 2017, through October 21, 2017. We concur with the trial court, and the record supports, that the description of the item to be searched and the possible information to be seized was sufficiently specific and narrowly tailored. **See Grossman**, 555 A.2d at 900; **see also Green**, 265 A.3d at 553.

For the reasons set forth herein, we discern no error of law or abuse of discretion in the trial court order denying Appellant's *omnibus* motion to suppress evidence uncovered during a search of Appellant's person and vehicle.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 11/15/2022